Affirmed in Part and Reversed and
Remanded in Part and Opinion filed November 30, 2010.



 



 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-08-00654-CV



 

Sandra Graves, Appellant

V.

Michael Tomlinson, BrYan Rice, HARTMAN LEITO & BOLT, LLP, AND RICE STEWART
FARIS & CO., Appellees

 



On Appeal from the County Court
at Law No. 2

Galveston County, Texas

Trial Court Cause No. 05-FD-1580



 

OPINION

Sandra Graves and Michael Tomlinson each appeal from the
trial court’s divorce decree on numerous grounds.  Sandra Graves also appeals from
the trial court’s separate judgment awarding fees in favor of court-appointed
auditor Bryan Rice and his firms Hartman Leito & Bolt, LLP, and Rice
Stewart Faris & Co.  We affirm in part and reverse and remand in part.

Background

Graves and Tomlinson were married on September 25,
1997.  Graves had three children when she married Tomlinson.  Graves’s older son,
Ron Graves, was born disabled in 1967; her younger son, Charles Babb, was born
in 1979; and her daughter, Rebecca Babb, was born disabled in 1982 and died in
1997.  Tomlinson had one daughter from a previous marriage.

When Graves and Tomlinson married, Tomlinson was
engaged in farming and ranching; he continued those activities during the
marriage.  Graves is a licensed home and community-based services program
provider for the Texas Department of Aging and Disability Services.

Graves formed a sole proprietorship called Sandra
Graves d/b/a All The Little Things Count in 1997.  This sole proprietorship provides
home and community-based services for mentally handicapped and disabled persons
in group homes, foster care, and supported home living.  Graves created a
limited liability company called All The Little Things Count, LLC in 2000.  The
LLC has been a home and community-based services program provider since May
2007.  Together, the sole proprietorship and the LLC employ about 100 people
and serve more than 300 clients.  

In December 1999, Graves created a non-profit
corporation called All The Little Things Country.  The corporation provides
services for multiple entities including All The Little Things Count; All The
Little Things Count, LLC; Volunteers of America; the Gulf Coast Mental Retardation
Authority; and the Harris County Mental Retardation Authority.

Graves filed for divorce in June 2005, and protracted
divorce proceedings ensued.  The parties had numerous discovery disputes throughout
the proceedings; they twice mediated discovery disputes and entered into
settlement agreements regarding their discovery disputes.  The case was tried
to a jury from January 14 through January 31, 2008.

In 17 questions, the jury was asked to determine (1) whether
grounds for divorce existed between the parties; (2) the characterization of the
parties’ property; (3) the value of numerous properties; (4) whether Graves
committed fraud with respect to the purchase of a building and payments she
made to her father and her ex-husband; (5) whether Tomlinson committed
constructive fraud or waste with respect to certain community property; (6) whether
Graves committed constructive fraud or waste with respect to certain community
property; and (7) Graves’s and Tomlinson’s reasonable and necessary attorney’s
fees, costs, and expert fees.

The trial court held several post-trial hearings.  Among
other things, the trial court considered the parties’ respective motions to
disregard certain of the jury’s answers.  The trial court also considered
Tomlinson’s pre-trial motion for sanctions, which the court had taken under
advisement.  Additionally, the trial court considered (1) the parties’ objections
regarding the division of property; and (2) a petition in intervention for
expert witness fees filed by court-appointed auditor Bryan Rice, and by Rice’s
former and current firms.  

The trial court signed a Final Decree of Divorce on
April 16, 2008.  The trial court also signed a judgment for expert witness fees
on April 16, 2008; this judgment made Graves and Tomlinson jointly and
severally liable for fees incurred by auditor Rice and his firms.  Graves filed
a request for findings of fact and conclusions of law in connection with the
divorce decree and the judgment for expert witness fees on May 5, 2008.  

On May 16, 2008, Graves filed a motion for new trial
with respect to (1) the final divorce decree; and (2) the judgment for expert
witness fees.  Graves simultaneously filed a motion to modify, correct, or
reform the final divorce decree and the judgment for expert witness fees, along
with numerous objections.  Graves filed a notice of past due findings of fact
and conclusions of law on June 2, 2008.  

The trial court filed findings of fact and
conclusions of law on February 4, 2009.  Among other things, the trial court’s
findings of fact identified numerous instances of litigation misconduct by
Graves warranting sanctions of $250,000 in attorney’s fees.  Graves and
Tomlinson timely filed their respective notices of appeal.

Analysis

I.                  
Graves’s Appeal

We begin by addressing Graves’s appeal before
addressing Tomlinson’s cross-appeal. 

A.        Judicial
Estoppel 

As a threshold matter, Tomlinson argues that Graves
is judicially estopped to pursue this appeal “due to her unequivocal position
and oral testimony in the Trial Court that she would accept whatever findings
the jury makes and whatever orders the Court makes.”  Tomlinson refers to an
exchange during trial in which Graves’s counsel asked her: “Will you accept
whatever findings the jury makes and whatever orders the Court makes?”  Graves
answered, “Yes, I will.”  We reject Tomlinson’s invocation of judicial estoppel
on this record. 

The doctrine of judicial estoppel bars a party who
has successfully maintained a position in a prior judicial proceeding from
later adopting an inconsistent position unless the party can show that the
prior statement was made inadvertently due to mistake, fraud, or duress.  Vinson
& Elkins v. Moran, 946 S.W.2d 381, 396 (Tex. App.—Houston [14th Dist.]
1997, writ dism’d).  Judicial estoppel upholds the sanctity of the oath and targets
the prejudice that would result to the administration of justice if a litigant
were allowed to swear one way one time and a different way another time.  Id.
 

Judicial estoppel applies when (1) a sworn, prior
inconsistent statement was made in a judicial proceeding; (2) the party now
sought to be estopped successfully maintained the prior position; (3) the prior
inconsistent statement was not made inadvertently or because of mistake, fraud,
or duress; and (4) the statement was deliberate, clear, and unequivocal.  Id. 


Judicial estoppel does not apply to a contradictory
position taken in the same proceeding; it comes into play only in a subsequent
action.  Id. at 397 (citing Wells v. Kansas Univ. Endowment Ass’n,
825 S.W.2d 483, 488 (Tex. App.—Houston [1st Dist.] 1992, writ denied)).  An
appeal in the same case is not a “subsequent action” to which judicial estoppel
applies.  See id.  Because Graves’s appeal is not a subsequent action,
judicial estoppel is inapplicable here.  In any event, the quoted exchange does
not provide a reasonable basis for concluding that Graves intended to waive her
appellate rights. Accordingly, we overrule Tomlinson’s issue predicated on
judicial estoppel. 

B.        Sufficiency
of the Evidence

In her first issue, Graves raises three sub-issues challenging
the sufficiency of the evidence supporting (1) certain jury findings adverse to
her; and (2) the trial court’s decision to disregard a jury finding in her
favor.

1.      Farm
and ranch equipment

In her first sub-issue, Graves argues that there is
legally and factually insufficient evidence to support the jury’s finding that
40 percent of the farm and ranch equipment was Tomlinson’s separate property.

Graves argues that Tomlinson’s sworn Amended
Inventory and Appraisement dated January 11, 2008, in which he listed the farm
and ranch equipment as community property, constitutes a judicial admission
that the equipment is indeed community property.  Graves also argues that
Tomlinson’s “conclusory testimony, uncorroborated by documentation and contrary
to his sworn inventory, is insufficient” under a clear and convincing burden of
proof to support the finding that 40 percent of the equipment was Tomlinson’s
separate property. 

The Texas Family Code defines separate property as
that property owned or claimed by a spouse before marriage, acquired during the
marriage by gift, devise, or descent, or as a recovery for personal injuries
sustained during the marriage.  Tex. Fam. Code Ann. § 3.001 (Vernon 2006); Barnett
v. Barnett, 67 S.W.3d 107, 111 (Tex. 2001).  Community property consists of
the property, other than separate property, acquired by either spouse during
marriage.  Tex. Fam. Code Ann. § 3.002 (Vernon 2006); Barnett, 67 S.W.3d
at 111.  All property possessed by either spouse during or upon dissolution of the
marriage is presumed to be community property.  Tex. Fam. Code Ann. § 3.003(a)
(Vernon 2006); Barnett, 67 S.W.3d at 111.  

To overcome the community property presumption, a
spouse claiming assets as separate property must establish their separate
character by clear and convincing evidence.  Tex. Fam. Code Ann. § 3.003(b); Stavinoha
v. Stavinoha, 126 S.W.3d 604, 607 (Tex. App.—Houston [14th Dist.] 2004, no
pet.).  “Clear and convincing” evidence means the measure or degree of proof
that will produce in the mind of the trier of fact a firm belief or conviction
as to the truth of the allegations sought to be established.  In re J.F.C.,
96 S.W.3d 256, 264 (Tex. 2002); Stavinoha, 126 S.W.3d at 607; see
also Tex. Fam. Code Ann. § 3.003(b).  

“The spouse claiming that certain property is
‘separate’ must trace and clearly identify the property claimed to be
separate.”  Zagorski v. Zagorski, 116 S.W.3d 309, 316 (Tex. App.—Houston
[14th Dist.] 2003, pet. denied).  Tracing involves establishing the separate
origin of the property through evidence showing the time and means by which the
spouse originally obtained possession of the property.  Id.  As a
general rule, the clear and convincing standard is not satisfied by testimony
that property possessed at the time the marriage is dissolved is separate
property when that testimony is contradicted or unsupported by documentary
evidence tracing the asserted separate nature of the property.  Zamarripa v.
Zamarripa, No. 14-08-00083-CV, 2009 WL 1875580, at *3 (Tex. App.—Houston
[14th Dist.] Oct. 2, 2009, pet. denied) (mem. op.).  Any doubt as to the
character of property should be resolved in favor of the community estate.  Boyd
v. Boyd, 131 S.W.3d 605, 612 (Tex. App.—Fort Worth 2004, no pet.).

In a legal sufficiency review of a separate property
finding, we examine all the evidence in the light most favorable to the finding
to determine whether a reasonable trier of fact could have formed a firm belief
or conviction that its finding was true.  Stavinoha, 126 S.W.3d at 608; see
also In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2003).  Looking at the evidence
in the light most favorable to the finding means we must (1) assume that the
factfinder resolved disputed facts in favor of its finding if a reasonable
factfinder could do so; and (2) disregard all contrary evidence that a
reasonable factfinder could have disbelieved or found to have been incredible. 
Stavinoha, 126 S.W.3d at 608; see also In re J.F.C., 96 S.W.3d at
266.  However, we can consider undisputed facts that do not support the
finding.  Stavinoha, 126 S.W.3d at 608; see also In re J.F.C., 96
S.W.3d at 266.  If we determine that no reasonable fact finder could form a
firm belief or conviction of the truth of the matter to be proved, we must
conclude that the evidence is legally insufficient.  Stavinoha, 126
S.W.3d at 608; see also In re J.F.C., 96 S.W.3d at 266.  If we determine
that the evidence is factually insufficient, we must detail in our opinion why
we have concluded that a reasonable fact finder could not have credited
disputed evidence in favor of the finding.  Stavinoha, 126 S.W.3d at
609; see also In re J.F.C., 96 S.W.3d at 266-67.

During Graves’s trial testimony, the trial court
admitted her inventory into evidence; her inventory listed the farm and ranch
equipment as community property.   

On direct-examination, Tomlinson’s counsel questioned
Tomlinson regarding items of farm and ranch equipment that he considered to be
his separate property.  Tomlinson testified that 

·       
he purchased three tractors “used in mid — about ‘85 to ‘87;” 

·       
“The next one is a Model 986 tractor.  That’s about a 1979
model.  And that was bought and paid for, probably, in ‘81 or ’82;”

·       
“The next one is a Model 7140 MFD.  That was bought before the
marriage.  I possibly might have owed a little bit on that one after I was married
to Sandra, but the bulk of it was paid.  . . . I bought that in about ‘91, ‘92;”

·       
“The next two combines were bought and paid for before the marriage. 
They’re very old;”

·       
“The next one is a 30-foot Great Plains drill that I bought from
Alvin Equipment in Alvin.  I probably bought that in 1988.  It was bought and
paid for before the marriage;”

·       
“The next one is some real old Drag Harrows.  They’re pretty
poor. They’re rusted.  And those were bought, probably, in around ’92.  And I
bought and paid for those from EI Campo, Texas;”

·       
“The next three are shop made rollers that we don’t hardly use
much anymore, but I bought those at an auction in about 1988;” and  

·       
“The Taylor Way 3-point 8-foot blade is very, very old. I
probably bought that in the late Eighties.”

The trial court admitted Tomlinson’s
inventory into evidence; his inventory listed all of the farm and ranch
equipment as community property.  In discussing his inventory, Tomlinson stated
the equipment’s value should be $170,000 instead of the listed $280,850; he did
not comment on the inventory’s characterization of all farm and ranch equipment
as community property.

As noted above, the clear and convincing standard is
not satisfied by testimony that items possessed at the time the marriage is
dissolved are separate property when that testimony is contradicted or
unsupported by documentary evidence tracing the asserted separate nature of the
items. Zamarripa, 2009 WL 1875580, at *3; In re Marriage of
Santopadre, No. 05-07-00027-CV, 2008 WL 3844517, at *3 (Tex. App.—Dallas Aug.19,
2008, no pet.) (mem. op.).  Here Tomlinson’s testimony is contradicted by his
own sworn inventory and by Graves’s inventory.  Tomlinson offered no documents
to support his characterization of these assets in his testimony.  Therefore, no
reasonable fact finder could find that Tomlinson’s unsupported testimony constitutes
clear and convincing evidence necessary to overcome the community property
presumption and establish that 40 percent of the farm and ranch equipment was
Tomlinson’s separate property.  We sustain Graves’s first sub-issue.[1]

2.     
Value of All The Little Things Count and All The Little Things
Count, LLC

In her second sub-issue, Graves argues that that the
evidence is legally and factually insufficient to support the jury’s assessment
of the value of All The Little Things Count and All The Little Things Count,
LLC.  Unlike the separate property determination discussed above, to which the clear
and convincing burden of proof applied, the factual determination regarding valuation
was submitted in the jury charge under a preponderance of the evidence
standard.

a.      Legal
sufficiency standard

In reviewing the legal sufficiency of the evidence to
support a finding governed by a preponderance of the evidence standard, the
court must consider evidence in the light most favorable to the verdict; it
must credit favorable evidence if reasonable jurors could do so and disregard contrary
evidence unless reasonable jurors could not do so.  Del Lago Partners, Inc.
v. Smith, 307 S.W.3d 762, 770 (Tex. 2010) (citing City of Keller v.
Wilson, 168 S.W.3d 802, 822 (Tex. 2005)).  ‘“The final test for legal
sufficiency must always be whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review.”’  Id.
(quoting City of Keller, 168 S.W.3d at 827).

A legal sufficiency challenge will be sustained only
if (1) there is a complete absence of evidence of a vital fact; (2) the court
is barred by the rules of law or evidence from giving weight to the only
evidence offered to prove a vital fact; (3) the evidence offered to prove a
vital fact is no more than a scintilla; or (4) the evidence conclusively
establishes the opposite of a vital fact.  Marathon Corp. v. Pitzner,
106 S.W.3d 724, 727 (Tex. 2003).  More than a scintilla of evidence exists when
the evidence rises to a level that would enable reasonable and fair-minded
people to differ in their conclusions.  Ford Motor Co. v. Ridgway, 135
S.W.3d 598, 601 (Tex. 2004).  Evidence does not exceed a scintilla if it is so
weak as to do no more than to create a mere surmise or suspicion that the fact
exists.  Id. 

Following a jury trial, a legal sufficiency challenge
must be preserved in the trial court through one of the following procedural
steps: (1) a motion for instructed verdict; (2) a motion for judgment
notwithstanding the verdict; (3) an objection to the submission of the question
to the jury; (4) a motion to disregard the jury’s answer to a vital fact
question; or (5) a motion for new trial.  T.O. Stanley Boot Co. v. Bank of
El Paso, 847 S.W.2d 218, 220 (Tex. 1992); Cecil v. Smith, 804 S.W.2d
509, 510-11 (Tex. 1991).[2] 


Because Sandra’s sufficiency challenge focuses in
significant part on expert testimony, we also must consider the difference between
(1) a challenge to an expert’s methodology; and (2) a legal sufficiency challenge
predicated on a contention that an expert’s testimony lacks probative value.  See
Coastal Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 233
(Tex. 2004); Nip v. Checkpoint Sys., Inc., 154 S.W.3d 767, 770-71 (Tex.
App.—Houston [14th Dist.] 2004, no pet.).  These are two distinct inquiries.

“When the expert’s underlying methodology is
challenged, the court ‘necessarily looks beyond what the expert said’ to
evaluate the reliability of the expert’s opinion.”  Coastal Transp. Co.,
136 S.W.3d at 233.  “When the testimony is challenged as conclusory or
speculative and therefore non-probative on its face, however, there is no need
to go beyond the face of the record to test its reliability.”  Id.  Therefore,
“when a reliability challenge requires the court to evaluate the underlying
methodology, technique, or foundational data used by the expert, an objection
must be timely made so that the trial court has the opportunity to conduct this
analysis.”  Id.; Nip, 154 S.W.3d at 770-71.  However, when the
challenge is restricted to the face of the record — when expert testimony is
speculative or conclusory on its face — then a party may challenge the legal
sufficiency of the evidence even in the absence of any objection to its
admissibility.  Coastal Transp. Co., 136 S.W.3d at 233; Nip, 154
S.W.3d at 770-71. 

b.      Factual
sufficiency standard

In reviewing a factual sufficiency point, the court
must weigh all of the evidence in the record; findings may be overturned only
if they are so against the great weight and preponderance of the evidence as to
be clearly wrong and unjust.  Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex.
1996) (per curiam).  The court must clearly state why the jury’s finding is supported
by factually insufficient evidence or is so against the great weight and
preponderance as to be manifestly unjust.  Id.

A complaint that the evidence is factually
insufficient to support a jury finding must be raised in a motion for new trial
as a prerequisite to raising such a complaint on appeal.  Tex. R. Civ. P.
324(b)(2); Cecil, 804 S.W.2d at 510.

c.      Application
of standards

The jury assessed the value of All The Little Things
Count at $19,000 and the value of All The Little Things Count, LLC at
$1,250,000.  Graves contends that the jury should have assessed the value of All
The Little Things Count at a negative $87,000 and the value of All The Little
Things Count, LLC at $200,000.[3]

Graves contends that the “evidence bearing upon the
Jury’s valuation of the LLC includes: (i) Sandra’s testimony . . . ; (ii) Px59,
a summary of payments from the State of Texas to All The Little Things Count;
(iii) Michael Tomlinson’s testimony; (iv) the testimony and report of Sandra’s
business valuation expert Bill Stewart; (v) the testimony of Michael’s forensic
accountant Gregory Schuelke; and (vi) the testimony and report of Michael’s
business valuation expert David Palmer.”

According to Graves, her trial testimony establishes
the following facts:

In 2000, Sandra created a limited liability company named “All
The Little Things Count, LLC,” in order to limit her personal liability.  The
LLC has been an HCS provider since May, 2007.  Sandra’s business has grown, and
requires her to work long hours. The businesses employ about 100 persons and
serve 300 to 350 clients. 

In December 1999, Sandra created a non-profit corporation
named All The Little Things Country.  All The Little Things Country provides
services for Volunteers of America, Gulf Coast MHMR, and Harris County MHMR. 
The company’s tax returns for 2003, 2004, 2005 and 2006 were admitted into
evidence. The 2006 tax return reflects total revenue of $17,970.  All The
Little Things Country is a different corporation from All The Little Things
Count, LLC.  Sandra does not own it. She cannot sell it.  If it ever dissolves,
the assets must be distributed to a charitable Section 501 (c)(3) entity.  It
conducts board meetings.  Federal tax law and state law prohibit individuals
from improperly benefitting from a non-profit corporation.  “Country” never
paid Sandra a salary, or provided her hea[l]th insurance, or paid for upkeep on
her vehicle.  Its purpose is different. Sandra’s forensic accountant William
Stewart confirmed that she has never drawn any money out.  

Even if taken as a given, these
assertions do not establish that the jury’s valuation of All The Little Things
Count, LLC lacks sufficient evidence to support it.

            Exhibit 59 consists
of several e-mails from Marianne Reat, an attorney with the Department of Aging
and Disability Services; these e-mails (1) attach a spreadsheet that shows the
State paid All The Little Things Count, LLC $6,002,047.55 for claims it submitted
from August 2006 to December 2007; (2) provide the Health and Human Services
Commission website at which rate information can be accessed; and (3) inform
the parties about All The Little Things Count, LLC’s accounts receivable as of 
January 7, 2008.

            Graves argues
that Tomlinson’s “testimony about the value of Sandra’s businesses consists of
two words, ‘Yes, sir,’ with which he merely agrees with his valuation expert
David Palmer.  His inventory listed a community property value of $3.5 million
‘Per David Palmer, Tomlinson[’]s Expert.”  Graves argues that Tomlinson was not
“qualified to render an expert opinion on the value of [Graves’s] businesses”
and that his “conclusory statements amount to no evidence.”

            Graves contends
that her business valuation expert, William Stewart, “gave the only valuation
testimony the jury could rely on.”  Stewart valued the community property
interest at negative $87,000 with respect to the sole proprietorship All The
Little Things Count; $200,000 with respect to All The Little Things Count, LLC;
and zero with respect to the non-profit corporation, All The Little Things
Country.  He valued the sole proprietorship and the LLC separately because they
had different contract structures.

            Stewart explained
that there are three approaches available to valuing a business: the asset
approach, the market approach, and the income approach.  Stewart “found no
comparable businesses that had sales of ownership interests, ruling out the
market approach.”  Stewart also “rejected the income approach since it relied
on projecting future cash flows of the business, and his investigation
indicated that if [Graves] left the                          . . . LLC . . .
her customers would leave with her, taking their cash flow with them.”  Stewart
therefore used the asset approach to value the LLC at $400,000, but applied a
discount for lack of marketability of $200,000.  

Graves contends that the testimony of Tomlinson’s
forensic accountant, Gregory Schuelke, cannot support the jury’s $1,250,000 valuation
for the LLC because Schuelke did not “express an opinion as to the value of any
of the three entities” and “was not hired to determine value.  Instead, he was
hired to ‘normalize’ the accounting records of [Graves’s] businesses.”  Graves
acknowledges that, in normalizing the accounting records, Schuelke (1)
“adjusted assets from their depreciated book value to current value;” and (2)
“added back to income any expenses charged to the business that were not really
business expenses, such as allowances for family members, or nonrecurring
expenses like attorneys’ fees, or excess compensation paid to the owner.”  

Graves also argues that the valuation of Tomlinson’s
valuation expert, David Palmer, constitutes no evidence because his methodology
is flawed.  Graves claims that Palmer’s valuation methodology is flawed because
(1) none of the businesses he used as comparables for the market approach “provided
care for severely retarded people;” and (2) he valued Graves’s three businesses
together instead of assigning individual values to each entity.  Because
Palmer’s valuation was based on a flawed methodology, Graves contends that Stewart’s
valuation opinion was the only reliable valuation evidence the jury should have
considered.  Graves also contends that Palmer had inadequate time to prepare
his valuation.

Schuelke testified that Tomlinson hired Palmer and
him to conduct a business valuation for All The Little Things Count, All The
Little Things Count, LLC, and All The Little Things Country.  Schuelke focused
on the normalization of the companies’ business expenses and books.  Schuelke
explained that normalization is done because (1) certain assets or accounts
have to be adjusted to their market value; and (2) expenses that are not
business-related need to be excluded from the profit and loss statements. 
After explaining how the three entities are intertwined, Schuelke stated that
he combined them for purposes of his evaluation.  Schuelke also explained why
he concluded in his report that several adjustments had to be made:

State of Texas (Department of Aging and Disability
Services) records do not match reported revenue.  Adjustments should be
considered to agree [sic] revenue amounts ($159,129.03 — 11 months ended
November 2007).

Reported Country charges accounted for as expenses in the
financial documents of Count and Count, LC do not agree with revenue reported
by Country.  Adjustments should be considered to agree related Country Revenue
and Count/Count, LC Expenses ($242,501.74 — 11 months ended November 2007).

Significant professional fees have been incurred by the
collective businesses related to non-operational matters and were incurred for
matters that are not reasonably expected to continue.  Adjustments should be considered
to these expenses ($353,801.11 — 11 months ended November 2007).

Count reported an expense as Uncategorized in the amount of
$100,000.00.  No detail has been provided to date that establishes a business
operational purpose.  Thus, an adjustment should be considered.

Sandra Graves charged $108,000.00 to Count for “consulting
fees” in 2007.  An adjustment should be made to remove known compensation of
owner for the purpose of normalizing owner’s compensation.

*                                  *                                  *

In 2007, Count and Count LC reported $748,232.29 or
$378,776.83 and $369,455.46, respectively, for Country Day Hab related
charges.  During the same period, Country only reported Day Hab revenue from
Count/ Count LC to be $505,730.55.  The $242,501.74 difference should be
considered a normalizing adjustment for business valuation purposes.

*                                  *                                  *

Count and latter Count LC
receive funds from the State of Texas.  As stated above, roughly 98% of all
revenue is received from the State.  During the first eleven months of 2007,
Count received $5,910,445.51 and reported $6,181,135.40 or $270,689.89 less
than [sic] reported.  During the same period, Count LC received $5,401,776.17
and reported $4,971.957.25 or $429,818.92 more than [sic] reported.  The net
$159.129.03 ($429,818.92 less $270,689.89) should be considered as a
normalizing adjustment.

Schuelke stated that All The
Little Things Count, LLC paid at least $40,000 in professional fees related to
these divorce proceedings. Schuelke confirmed that for an 11-month period in
2007, he “added back in [$963,432] what is, basically, income and brought back
in the income that the company would have earned had the company not had some
nonrecurring expenses.”  This data then was processed by his colleague Palmer
in conducting the business valuation.  

Schuelke also noted a significant shift in revenue
from All The Little Things Count to All The Little Things Count, LLC.  “Count
was formed in 1997.  In 2006, Count LC began operation.  Gradually, the revenue
stream in Count shifted to Count LC.  Count currently has 10 times the assets
of Count LC.  But, as of November 2007, Count LC has 10 times the revenue.  No
intercompany charges relate to asset usage and no apparent distinction is made
on-site whether services are being provided by Count personnel or Count LC
personnel.”

Graves’s expert, Stewart, confirmed Schuelke’s
observation that the revenues for All The Little Things Count, LLC significantly
increased.  Stewart stated as follows in his report:

All the Little Things Count
LC is a Texas limited liability company that was established in May 2000 to
gradually take over the business of All the Little Things Count, the
sole proprietor.  This company was formed to operate with the same clients and
same employees, but with the benefits of a limited liability company under the
laws governing business entities.  A new provider contract was established for
handicapped persons with the State of Texas.  Clients have been moved gradually
beginning 2006, with the intent to move most or all clients eventually.  . . . 
Revenues and income for this company began to become significant in 2007.  

Schedule eight attached to
Stewart’s report listed All The Little Things Count, LLC’s gross profit as
$21,338 in December 2006 and $3,875,574 in October 2007.  

Palmer testified that he had adequate time to prepare
a valuation of Graves’s businesses.  Palmer explained that, after looking at
the transactions between the three businesses, he decided “the best way to look
at the value of the three entities was to push them all together and treat them
as if they were just one business with three different divisions.”  Palmer
explained that he used all three methodologies in his valuation; he gave the income
approach the most weight, the market approach some weight, and the asset
approach little weight.  

Palmer concluded that all three entities would have a
combined value of $1.5 million under the asset approach; $4.1 million under the
income approach; and $6.2 million under the market approach.  He explained the
process he used to assess value under each approach.  Palmer also listed the
revenue for each entity before combining the revenues used in his calculations. 
Based on an 11-month period in 2007, Palmer’s analysis listed the individual
revenue for All The Little Things Count as $6,313,758; the individual revenue for
All The Little Things Count, LLC as $5,000,477; and the individual revenue for All
The Little Things Country as zero.

Palmer explained how he calculated the value under
the market approach; he used data from sales of 28 comparable companies that
“seemed to be in the same relative industry group, that is, health care
services, providers like home health care or mental health.”  Palmer explained
that the data from the 28 companies he used reflected what willing buyers
actually paid for the comparable companies.  

Ultimately, Palmer computed a weighted average of the
$1.5 million, $4.1 million, and $6.2 million combined valuations of all three
entities.  The weighted average for all three entities was computed as $3.5
million after deducting $1 million for Graves’s goodwill.  

At bottom, Graves asks this court to “evaluate the
underlying methodology, technique, or foundational data used by the expert . .
. .”  Coastal Transp. Co., 136 S.W.3d at 233; Nip, 154 S.W.3d at 770-71. 
Graves did not object before or during trial on grounds that Palmer’s valuation
methodology was flawed.  Because Graves did not object to Palmer’s valuation
methodology before or during trial, she cannot attack his methodology on appeal
by way of a legal sufficiency challenge predicated on asserted flaws in his
methodology.  See Coastal Transp. Co., 136 S.W.3d at 233; Nip,
154 S.W.3d at 770-71.  The jury was entitled to rely on Palmer’s testimony and
report in assessing the value for All The Little Things Count, LLC just as it
was entitled to rely on Schuelke’s and Stewart’s testimony and report.

In any event, Graves cannot demonstrate a lack of
sufficient evidence by pointing to Palmer’s global valuation figure for all
three entities and insisting that an individual valuation for each entity was
necessary.  Palmer’s report contained the calculations he used under each
approach in valuing the three entities.  The report listed the individual revenues
of each entity, which formed the basis for Palmer’s calculations and valuation
under the market and income approaches.  Palmer assigned 2007 revenue among the
three entities as follows:  $6,313,758 to All the Little Things Count;
$5,000,477 to All the Little Things Count, LLC; and $0 to All the Little Things
Country.  

The data in Palmer’s report permitted calculation of an
individual valuation for All the Little Things Count, LLC based on the market
approach using the LLC’s individually assessed income of $5,000,477.  Applying Palmer’s
market approach multiples to this income figure yields an individual valuation
for the LLC that exceeds the $1,250,000 value assessed by the jury.[4] 
Therefore, the jury’s valuation of the LLC permissibly fell within a range established
by Palmer’s data on the high end and Stewart’s computation on the low end.  See
Moore v. Bank Midwest, N.A., 39 S.W.3d 395, 401 (Tex. App.—Houston [1st
Dist.] 2001, pet. denied); Pelzig v. Berkebile, 931 S.W.2d 398, 404
(Tex. App.—Corpus Christi 1996, no writ);  cf. Howell Crude Oil Co.
v. Donna Refinery Partners, Ltd., 928 S.W.2d 100, 108 (Tex. App.—Houston
[14th Dist.] 1996, writ denied); City of Houston v. Harris Cnty. Outdoor
Adver. Ass’n, 879 S.W.2d 322, 334 (Tex. App.—Houston [14th Dist.] 1994,
writ denied).

Considering the evidence in the light most favorable
to the verdict, we conclude that there is more than a scintilla of evidence to
support the jury’s finding regarding the value of All The Little Things Count,
LLC.  Weighing the evidence in the record before us, we cannot conclude that
the jury’s valuation finding is so against the great weight and preponderance
of the evidence as to be clearly wrong and unjust.  The evidence is legally and
factually sufficient; we therefore overrule Graves’s second sub-issue.

3.      Tomlinson’s
debt to his parents

In her third sub-issue, Graves argues that the trial
court erred by disregarding the jury’s finding in Question 11 that Tomlinson
committed “constructive fraud/waste with respect to his and [Graves’s]
community property rights by incurring indebtedness and encumbering community
property in favor of his parents” in the amount of $239,000.  Graves argues
that the trial court erred by (1) disregarding the jury’s answer to Question
11; and (2) treating Tomlinson’s debt as a bona fide debt.  

A trial court may disregard a jury finding only if it
is unsupported by evidence or if the issue is immaterial.  Spencer v. Eagle
Star Ins. Co. of Am., 876 S.W.2d 154, 157 (Tex. 1994).  A question is
immaterial when it should not have been submitted or calls for a finding beyond
the province of the jury, such as a question of law.  Se. Pipe Line Co. v.
Tichacek, 997 S.W.2d 166, 172 (Tex. 1999). 

Graves contends that the “Supreme Court has held that
a jury finding of fraud on the community is binding on the trial court,” citing
Cockerham v. Cockerham, 527 S.W.2d 162, 173 (Tex. 1975).  However, the
supreme court did not make a blanket pronouncement in Cockerham that a
fraud on the community finding always is binding on a trial court.  Rather, the
supreme court held that the trial court should not have disregarded the jury’s
answer in Cockerham because the testimony “was sharply conflicting on
this issue [whether the wife had fraudulently taken community property to make
gifts] and there was certainly at least some evidence to support the jury’s
answer.”  See id.  Therefore, a jury’s answer may not be disregarded
when there is “at least some evidence to support the jury’s answer.”  See
id.

The jury charge provided the following instructions
in connection with Question 11:

A spouse may make moderate gifts, transfers, or
expenditures of community property for just causes to a third party.  However,
a gift, transfer, or expenditure of community property that is capricious,
excessive, or arbitrary is unfair to the other spouse.  Factors to be
considered in determining the fairness of a gift, transfer, or expenditure are—

1.         the relationship between the spouse making the
gift, transfer, or expenditure and the recipient;

2.         whether there were any special circumstances
tending to justify the gift, transfer, or expenditure;

3.         whether the community funds used for the gift,
transfer, or expenditure were reasonable in proportion to the community estate
remaining.

Constructive fraud does not
require an intent to deceive.  It is the consequence of the breach of the
relationship of trust and confidence between spouses involving a transfer, gift
or waste or dissipation of community property that is capricious, excessive or
arbitrary resulting in unfairness to the other spouse.[5]

Graves argues in her brief that the Agreed Temporary
Orders in this case prohibited the parties from encumbering their property
except for reasonable and necessary living expenses for food, clothing,
shelter, transportation, medical care, reasonable attorney’s fees and expenses,
and acts reasonable and necessary to conduct usual business or occupation. 
Graves argues that the “evidence showed that in June of 2006, during the
divorce, [Tomlinson’s] divorce attorney, Mr. Rader, prepared a deed of trust
and security agreement in favor of [Tomlinson’s] parents for a supposed
$147,000 promissory note.” In exchange for this promissory note, Tomlinson gave
his parents a security interest in everything he owned.  Graves asserts that
Tomlinson neither provided a note to the independent auditor nor offered a
promissory note at trial.  Graves claims that Tomlinson offered only a copy of
a July 17, 2006 check for $50,000 from his father to him, and a copy of a December
26, 2007 check for $25,000 check from his mother to him.  

Neither these arguments nor the evidence cited in
Graves’s brief constitute a scintilla of evidence to support the jury’s finding
of constructive fraud or waste in the amount of $239,000.  

First, Graves states that the trial court’s agreed
temporary orders prohibited encumbering the parties’ property except for “reasonable
and necessary living expenses for food, clothing, shelter, transportation, and
medical care, reasonable attorney’s fees and expenses, and acts reasonable and necessary
to conduct usual business or occupation.” But she does not claim or cite to any
evidence showing that Tomlinson encumbered the parties’ property in violation
of these temporary orders.  Evidence that the temporary orders prohibited the
parties from encumbering their property except as specifically enumerated in
the orders does not establish that Tomlinson violated the orders.

Constructive fraud or waste is not established by
evidence that (1) Tomlinson’s attorney prepared a deed of trust and security
agreement in favor of Tomlinson’s parents for $147,000; (2) Tomlinson offered
the security agreement and deed of trust but not a promissory note into
evidence; and (3) Tomlinson offered a copy of a $25,000 check from his mother
and a $50,000 check from his father into evidence.  At most, these facts
establish that Tomlinson’s parents loaned Tomlinson $147,000 and wrote him
checks for $75,000.  These facts do not establish constructive fraud or waste
because they do not show that Tomlinson’s debt to his parents was “capricious,
excessive or arbitrary resulting in unfairness to the other spouse” as required
by the jury instructions.

Second, Graves argues that the loan amounts Tomlinson
testified about at trial “do not add up.”  Graves argues that Tomlinson first
agreed with his attorney that his parents loaned him $169,000 and that his
mother sent him another $40,000 to pay his attorney; Tomlinson later agreed
with his attorney that his parents loaned him $147,000 and $52,000.  Tomlinson’s
inability to recall the specific amounts he borrowed from his parents does not
translate into some evidence of constructive fraud or waste.

Third, Graves argues that the jury found that
Tomlinson committed constructive fraud or waste in connection with his cattle,
horses, farming equipment, and farming operations.  The jury heard testimony
that (1) Tomlinson did not account for his farm and ranching income; (2) his
tax returns showed more income than his accounting ledgers; and (3) there was
no promissory note.  Graves concludes that there “was more than a scintilla of
evidence to support the jury’s finding, and the trial court reversibly erred in
disregarding it.”  However, a finding of constructive fraud or waste in
connection with cattle, horses, equipment or farming operations does not
establish a scintilla of evidence that Tomlinson also committed constructive
fraud or waste when he borrowed money from his parents and encumbered the
parties’ property.

Graves’s argument and cited evidence do not establish
more than a scintilla of evidence that Tomlinson committed constructive fraud
or waste because they do not show that the debt Tomlinson incurred was
“capricious, excessive or arbitrary resulting in unfairness to” Graves.  We
conclude that the trial court did not err in disregarding the jury’s finding in
Question 11.  We overrule Graves’s third sub-issue.

C.        Debts Not
Included in Property Division 

In her second issue, Graves contends that the trial
court “erred in ignoring $305,369 in debts” and “$225,841 in attorneys’ fees”
owed by Graves in making the property division because a trial court must
consider all legitimate debts of the parties in making the property division. 
Graves argues that the trial court disregarded her debts and attorney’s fees in
its decree by removing the following items from the recognized list of debts (1)
Wells Fargo #8126; (2) Office Max #7145; (3) Continental Airlines #0245; (4)
Sam’s Club #6065; (5) Sam’s Club #3056; (6) Wells Fargo line of credit
#7043-34; (7) a $25,000 debt owed to attorney Arch McCall; and (8) $200,841 in
unpaid attorney’s fees owed to Looper, Reed & McGraw and Mills Shirley, LLP.

The trial court did not disregard Graves’s debts and
attorney’s fees in the divorce decree.  The trial court considered Graves’s
debts and specifically listed the following debts in its decree under the
heading “Division of Marital Estate:” 

a.         American
Express ending in 6009 in the name of SANDRA C. GRAVES;

b.         Wells
Fargo ending in 5883 in the name of SANDRA GRAVES d/b/a All Little Things
Count;

c.         Wells
Fargo ending in 8126 in the name of SANDRA GRAVES d/b/a All the Little Things
Count;

d.         Bank
of America ending in 4020 in the name of SANDRA C. GRAVES;

e.         OfficeMax
Account ending in 7145 in the name of SANDRA GRAVES d/b/a All the Little Things
Count;

f.          Continental
Airlines credit card ending in 0245 in the name of SANDRA GRAVES d/b/a All the
Little Things Count;

g.         Discover
account ending in 0914 in the name of SANDRA C. GRAVES;

h.         Sam’s
Club account ending in 3056 in the name of SANDRA GRAVES d/b/a All the Little
Things Count;

i.          Wells
Fargo Business Loan ending in 7043-34 in the name of SANDRA CAROL GRAVES;

j.          Sums owing on
promissory note payable to Arch McColl;

k.         Sums owing to
Charles Holbrook.

The trial court did not
specifically list Sam’s Club account #6065 — a debt totaling $450.73 as of
December 18, 2007.  The trial court nonetheless included this debt by stating
in the paragraph immediately following the enumerated debts that Graves should
also pay “Any and all debts, charges, liabilities, and obligations incurred
solely by SANDRA C. GRAVES from and after September 25, 1997, unless express
provision is made in this decree to the contrary.” 

The trial court also considered Graves’s outstanding attorney’s
fees.  In its decree, the trial court ordered that “[e]ach party shall be
responsible for his or her own attorney’s fees, expenses, and costs incurred as
a result of legal representation in this case, except as specifically provided
herein.”  Therefore, Graves’s assertion that the trial court disregarded her unpaid
debts and attorney’s fees is not supported by the record before us. 
Accordingly, we overrule Graves’s second issue.

D.        Sanctions

In her third issue, Graves contends that the trial
court erroneously assessed  attorney’s fees of $250,000 against her as
sanctions because (1) the award exceeded attorney’s fees actually incurred by
Tomlinson; (2) portions of the claimed fees had been settled and paid before
trial; (3) $166,150.75 of Tomlinson’s fees already had been paid; (4) the
sanction was waived because it was not granted prior to trial; (5) “the
sanction was not just and bore no rational or reasonable relationship to
Sandra’s conduct, and the sanction was not the minimum necessary to secure
compliance with the discovery requests;” and (6) the evidence did not support
the sanctions. 

We review a trial court’s sanctions award for abuse
of discretion.  Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238,
241 (Tex. 1985); see Low v. Henry, 221 S.W.3d 609, 614 (Tex. 2007). 

The sanction imposed in this case is significant by
any measure, and the trial court’s views regarding the propriety of Graves’s
litigation conduct are evident.  Although the choice of sanctions lies within
the trial court’s sound discretion, the sanctions imposed nonetheless must be
just.  TransAmerican Nat’l Gas Corp. v. Powell, 811 S.W.2d 913, 917
(Tex. 1991).  Whether sanctions are just is measured by two standards.  Id. 
First, a direct relationship must exist between the offensive conduct and the
sanctions imposed; the sanctions must relate directly to the abuse that
prompted them.  Id.  Second, sanctions may not be excessive.  Id.


An additional safeguard comes into play when
sanctions are predicated on conduct during pre-trial discovery.  The failure to
obtain a pre-trial ruling on discovery disputes that exist before commencement
of trial constitutes a waiver of a claim for sanctions based on that conduct.  Remington
Arms Co. v. Caldwell, 850 S.W.2d 167, 170 (Tex. 1993).  This safeguard
forecloses a belated invocation of unadjudicated pre-trial discovery disputes
as a basis for undoing or modifying the results at trial.  See id.  It does
not foreclose sanctions for discovery abuse revealed for the first time during
or after trial, which by definition could not have been addressed earlier.  See
id.

In conclusion of law number two, the trial court provided
the following explanation for assessing $250,000 in Tomlinson’s attorney’s fees
as a sanction against Graves:

The actions of Sandra Graves
in committing discovery abuse during these proceedings, fraudulent transfers
made during these proceedings and her false and misleading testimony given in
these proceedings compels this court to impose sanctions upon her, which
sanctions are assessed by the imposition of reasonable and necessary attorney
fees and expenses incurred by Michael Tomlinson during these trial proceedings in
the amount of $250,000.00 and appellate fees as found by the jury.

The trial court thus imposed
a global sanctions award of $250,000 in attorney’s fees for all of Graves’s collective
misconduct during the divorce proceedings.

            It appears from
the record that at least some of the parties’ discovery disputes resulted in pre-trial
rulings.  In finding of fact number one, the trial court referred to “numerous
discovery violations and discovery abuses” but did not enumerate or specifically
describe them.  Therefore, we cannot determine whether Tomlinson obtained
pre-trial rulings on all of the unspecified discovery disputes encompassed by
finding of fact number one.  See id.  We cannot determine whether the discovery
abuse referenced in finding of fact number one encompasses misconduct that was
revealed for the first time during or after trial so as to allow the imposition
of sanctions even without a pre-trial ruling.  See id.  

Because we cannot tell which portion of the $250,000 sanction
is attributable solely to discovery abuse, we also cannot determine whether the
$250,000 sanction is (1) directly related to discovery violations referred to
in finding of fact number 1; and (2) not excessive.  See TransAmerican,
811 S.W.2d at 917; see also Campbell v. Campbell, 03-07-00672-CV, 2010
WL 2477782, at *6 (Tex. App.—Austin June 18, 2010, no pet.) (mem. op.) (“the
record contains no justification for the amounts of sanctions imposed.  Even if
we assume that [party] actually committed the sanctionable acts alleged, the
record contains no explanation or analysis of how the sanctions imposed were
proportionate to the . . . acts.”) 

In findings of fact numbers two through 11, the trial
court identified additional misconduct by Graves.  Some of this misconduct is
discovery-related, and some is not:

2.         SANDRA GRAVES contemptuously disobeyed this
court’s orders and injunctions during the pendency of these proceedings by
transferring monies and assets from the community properties to All the Little
Things Country, a Texas Non-Profit Corporation controlled and directed by her.

3.         SANDRA GRAVES repeatedly, intentionally and
knowingly made misleading statements under oath in the proceedings before this
court and repeatedly lied under oath to the court.

4.         SANDRA GRAVES transferred community assets
having a value in excess of $1,000,000.00 to her father during the pendency of
these proceedings, in direct violation of this court’s orders and injunctions,
and the parties agreed temporary orders.

5.         SANDRA GRAVES intentionally, knowingly and
repeatedly misled the court as to the content of computer files containing
accounting information maintained by her in a QuickBooks format, in which she
asked the court for protection from prior discovery orders, wherein she had
previously agreed to provide Michael Tomlinson and his counsel, access to this
information.  She falsely informed the court, through her attorneys, and under
oath in testimony before the court, that those records contained information protected
by federal law (HIPAA).  The court relied on these false statements and assertions
and restricted Michael Tomlinson's access to such information, placing a
greater burden on him, and resulting in his being unable to complete a full
investigation of community assets because of his lack of resources and because
of the timing of his eventual access to such information, which the court,
regretfully, had limited in reliance on such testimony and representations by
counsel for SANDRA GRAVES during these proceedings.  

6.         As a direct result of SANDRA GRAVES misleading
this court and concealing information requested by Michael Tomlinson, Michael
Tomlinson was unable to secure a complete discovery of facts in these
proceedings.

7.         SANDRA GRAVES defrauded Michael Tomlinson by
co-mingling community assets with a non-profit corporation known as “All the
Little Things Country”, a Texas non-profit corporation, which was solely
controlled by Sandra Graves and was used by her to defraud the community. 

8.         In December 2005, SANDRA GRAVES transferred
approximately $200,000.00 in cashier’s checks to her son, Charles Babb during
the pendency of these proceedings, which he then used for the purchase of the
real property known as 1117 Lawrence, Rosenberg, Fort Bend County, Texas.  This
transaction was not disclosed to Michael Tomlinson, despite discovery requests
for such information.  The court has subsequently severed Michael Tomlinson’s
claim to that real property, which was an office building used by Sandra
Graves’s companies, All the Little Things Count, LLC and All the Little Things Country,
a Texas non-profit corporation.

9.         The liabilities set forth in the exhibit
identified in the record as Court Exhibit 1, pages 1 through 9, marked by the
Court for identification and dated March 20, 2008, which exhibit is attached
hereto and incorporated herein by reference, were either stipulated to by the
parties; or if not agreed to, are incorporated as findings of this court.

10.       SANDRA GRAVES paid attorneys’ fees and expenses
to attorneys and expert witnesses in these proceedings from community assets
(monies) in excess of $1,000,000.00 (one million dollars).  The Court finds
that these payments violated the parties TRCP Rule 11 Agreed Temporary Orders
and was a contempt of such Order.

11.       Attorneys fees and expenses
incurred in excess of those sums found in jury question number 17 ($540,000.00)
with respect to Sandra Graves’ expenditures are found to be a waste of
community assets and a violation of the parties agreements including a violation
of the courts Agreed Temporary Orders.

Insofar as this misconduct relates to discovery, we
cannot determine from the record before us whether Tomlinson obtained pre-trial
rulings as required under the Remington Arms case.  See 850
S.W.2d at 170.  We cannot determine whether some or all of the discovery abuse encompassed
by these findings was revealed for the first time during or after trial.  See
id.  We cannot determine which portion of the global $250,000 sanction relates
to the discovery misconduct referred to in findings of fact numbers 2 through
11, and we cannot determine whether that portion bears a reasonable
relationship to the misconduct.  See TransAmerican, 811 S.W.2d at 917.

Similarly, we cannot determine which portion of the
global $250,000 sanction award is attributable to non-discovery-related
misconduct.  TransAmerican demands (1) a direct relationship between the
amount of sanctions and the sanctionable conduct; and (2) that the sanctions
not be excessive. See TransAmerican, 811 S.W.2d at 917; see also
Campbell 2010 WL 2477782, at *6.  On this record, we cannot assess whether
these requisites have been satisfied. 

            The trial court’s
global sanctions award must be reversed and remanded for further proceedings
consistent with the standards discussed above.  See TransAmerican, 811
S.W.2d 917-18; Remington Arms Co., 850 S.W.2d at 170-71.  Accordingly,
we sustain Graves’s third issue.[6]


E.        Just and Right Property
Division

In her fourth issue, Graves argues that the trial
court’s property division was not just and right.  She contends that the trial
court abused its discretion in determining the scope of community property to
be divided because the evidence (1) does not support the jury’s finding that 40
percent of the farm and ranch equipment was Tomlinson’s separate property; (2)
shows that the jury overvalued All The Little Things Count and All The Little
Things Count, LLC; (3) supports the jury’s finding that Tomlinson’s debts to
his parents of $239,000 were constructively fraudulent or waste; and (4)
establishes the trial court disregarded Graves’s unpaid debts of $305,369 and
unpaid attorney’s fees of $225,841.[7]

In light of our disposition of Graves’s first and
second issues, we address only whether the trial court abused its discretion in
making its “just and right” division by relying on the jury’s finding that 40
percent of the parties’ farm and ranch equipment was Tomlinson’s separate
property.  

In a divorce decree, the trial court “shall order a
division of the estate of the parties in a manner that the court deems just and
right, having due regard for the rights of each party.”  Tex. Fam. Code Ann. §
7.001 (Vernon 2006).  To disturb the trial court’s division of property, Graves
must show the trial court clearly abused its discretion by a division or an
order that is manifestly unjust and unfair.  Sharma v. Routh, 302 S.W.3d
355, 360 (Tex. App.—Houston [14th Dist.] 2009, no pet.); Stavinoha, 126
S.W.3d at 607.  Under this abuse of discretion standard, the legal and factual
sufficiency of the evidence are not independent grounds of error; they are
relevant factors in assessing whether the trial court abused its discretion.  Sharma,
302 S.W.3d 360; Stavinoha, 126 S.W.3d at 608.  

We must remand the entire community estate for a new
division when we find reversible error that materially affects the trial court’s
just and right division of the property because only the trial court may make a
just division of community property.  Stavinoha, 126 S.W.3d at 608; McElwee
v. McElwee, 911 S.W.2d 182, 189 (Tex. App.—Houston [1st Dist.] 1995, writ
denied).  The appellate court determines only whether the trial court abused
its discretion in making the division.  McElwee, 911 S.W.2d at 189.

Having concluded above that the evidence is legally
insufficient to support a characterization of the farm and ranch equipment as
Tomlinson’s separate property, we now consider whether this characterization
caused the trial court to abuse its discretion in making its property division. 


If the trial court characterizes community property
as separate property, then the property does not get divided as part of the
community estate.  Id.  If the mischaracterized property has value that
would have affected the trial court’s just and right division, then the
mischaracterization is harmful and requires the appellate court to remand the
entire community estate to the trial court for a just and right division of the
properly characterized community property.  Stavinoha, 126 S.W.3d at
617; McElwee, 911 S.W.2d at 189.  If, on the other hand, the
mischaracterized property had only a de minimis effect on the trial court’s
just and right division, then the trial court’s error is not an abuse of
discretion.  Stavinoha, 126 S.W.3d at 617; McElwee, 911 S.W.2d at
189.

Characterizing 40 percent of the farm and ranch
equipment as Tomlinson’s separate property means the trial court did not
consider at least $134,000 in community property in dividing the community
estate.[8]
 We agree with Graves that failing to consider $134,000 in dividing the
community estate has more than a de minimis effect on the trial court’s
just and right division.  The trial court’s characterization materially
affected the court’s just and right property division, requiring reversal and
remand of the entire community estate to the trial court for a just and right division
of the properly characterized community property.  Accordingly, we sustain
Graves’s fourth issue.

F.        Court-Appointed
Auditor’s Fees

In her fifth issue, Graves asserts that the trial
court erred by making Graves “liable for half of the unpaid auditor’s fees of
$42,851.”  Graves claims that “[b]y agreed court order, the auditor’s fee was
to be split 50-50, and [Graves] has already paid more than her half of the
total fee.  The Divorce Decree and Judgment for Expert Witness Fees result in
[Graves] having to pay all or three quarters of the fee, in violation of the
agreed court order.”[9] 


By agreement of the parties, the trial court
appointed CPA Rice on March 10, 2006 to serve as independent auditor and
conduct an unlimited audit of all the parties’ personal and business assets. 
In the agreed discovery order, the trial court ordered the “Parties to split
Receiver and Independent Auditor fees 50/50.”  Rice incurred fees of
$94,780.35, and Graves paid $51,929.35 before trial to two firms Rice worked
for during the proceedings.  After the jury trial, the parties discussed
payment of the auditor’s fees at several post-trial hearings.

At the February 4, 2008 post-trial hearing, Graves
asked the trial court to order Tomlinson to pay the remaining auditor’s fees
out of his community estate share.  At the March 20, 2008 post-trial hearing,
Graves again requested the trial court to order Tomlinson to pay the remaining
auditor’s fees out of his community estate share.  The trial court stated, “Whatever
he has not paid to this point, he needs to payout [sic] of his division.”  Tomlinson
objected and argued that whatever amount Graves paid in auditor’s fees to date
had been paid with community property.

At the March 27, 2008 post-trial hearing, the parties
again discussed the payment of the auditor’s fees.  At the end of the hearing
the trial court stated, “All right.  Well, whatever costs are not in the jury
award will be the liability of the parties themselves and Bryan Rice’s fees
will stay the same as it always was, to be divided evenly between the
parties.”  

Bryan Rice and the two firms he worked for while
serving as the court-appointed auditor filed a petition in intervention for
expert witness fees on April 7, 2008.  The trial court held another post-trial
hearing the next day.  Tomlison argued that  “we are being charged Bryan Rice’s
fees as court costs which we have to pay out of his half award, not from the
community property as our Rule 11 agreement had said that we were each going to
pay 50 percent of it, which would have been a community property liability.”

The trial court also addressed the petition in
intervention filed by Rice and the firms.  The parties agreed that a separate
judgment should be signed awarding $42,851 in favor of Rice and the two firms,
but the parties continued arguing about who should pay those fees: 

TOMLINSON’S COUNSEL: According to the Rule 11 agreement, it
should be a community liability, Judge. Each one of them was to pay 50 percent
of it out of the community.  That was the community agreement.   Now Mike is
getting charged that out of his separate portion.  It’s just not fair.  She’s
had access to all of these funds.  She’s spent millions dollars during this
proceeding.

GRAVES’S COUNSEL: I’m going to object to all that, Your
Honor.

THE COURT: Well, it’s coming from community; and she’s
getting half the community and he’s getting half the community.

TOMLINSON’S COUNSEL: No, it’s not coming from the
community. It’s coming out of his one half which will be separate property.  He
wasn’t given that as a liability.  He wasn’t credited that. That would be a
community liability if it were coming out of the community. You didn’t have
that as —

COURT: I understand what you are saying.

TOMLINSON’S COUNSEL: Yeah.

COURT: And I think you are right. I think it needs to be
paid before we divide up the community.

TOMLINSON’S COUNSEL: Right. There you go.

The trial court then
instructed counsel for Rice and the firms to draft a separate judgment
assessing the auditor’s fees one half against Tomlinson and one half against
Graves.

            At the April 15,
2008 post-trial hearing, Graves objected to the trial court signing a separate
judgment in favor of Rice and the firms making Tomlinson and Graves jointly and
severally liable for the auditor’s fees.  Nevertheless, the trial court signed
the separate judgment.

We disagree with Graves’s assertion that “The Divorce
Decree and Judgment for Expert Witness Fees result in [Graves] having to pay
all or three quarters of the fee.” Graves does not dispute Tomlinson’s
assertion that Rice’s fees have been paid using only community property, and
that community property is equally owned by a husband and wife during their
marriage.  Because community property was used to pay Rice, the fact that
Graves is the only one who has paid Rice and the firms to date does not
establish that she paid more than half of the fees.  We cannot conclude that
Graves would pay a disproportionate amount of the auditor’s fees under the
trial court’s divorce decree and judgment for expert witness fees.  Further, we
cannot agree with Graves that ordering the parties to pay the remaining
auditor’s fees equally would be unfair or contrary to the March 10, 2006
order.  

We conclude that the trial court did not err by
ordering the auditor’s fees be paid jointly and severally by Tomlinson and
Graves.  We overrule Graves’s fifth issue.

G.        Interest on Appellate
Attorney’s Fees

In her sixth issue, Graves asserts that the divorce
decree “levies interest on all of [Tomlinson’s] appellate fees beginning on the
date the appeal is perfected.”  Citing Southwestern Bell Telephone Co. v.
Vollmer, 805 S.W.2d 825, 834 (Tex. App.—Corpus Christi 1991, writ denied),
and Republic National Life Insurance Co. v. Beard, 400 S.W.2d 853,
859-60 (Tex. Civ. App.—San Antonio 1966, writ ref’d n.r.e.), Graves asserts
that “Under Texas law, the starting date for interest on appellate attorneys
fees is the date appeal is taken in the particular appellate court.”

Graves did not object to or otherwise raise her
complaint through a post-trial motion regarding the accrual of interest in the
trial court.  Therefore, we do not address it.   Tex. R. App. P. 33.1.; Marsalise
v. Wallace, No. 03-04-00277-CV, 2005 WL 1116010, at *1 (Tex. App.—Austin
May 12, 2005, no pet.) (mem. op.).   

We overrule Graves’s sixth issue.

H.        Omitted
Liabilities and Omitted Property Provisions 

In her seventh issue, Graves contends that the trial
court’s decree “erroneously awarded to the opposing party all property ‘not
fully disclosed’ by one party to the opposing party, as of the date of divorce,
and required the party incurring a debt not mentioned in the decree of divorce
to pay that debt.”

Graves contends that the decree’s “omitted
liabilities” provision “collides with [Texas Family Code] Section 9.201, and
violates the requirement of a just and right division based on the equities.”  As
a prerequisite to presenting a complaint for appellate review, the record must
show that the complaint was made to the trial court by a timely request,
objection, or motion stating the grounds for the ruling that the complaining
party sought from the trial court with sufficient specificity to make the trial
court aware of the complaint.  Tex. R. App. P. 33.1(a)(1).  The record does not
reflect that Graves raised a complaint in the trial court regarding the decree’s
omitted liabilities provision; therefore, Graves has not preserved her
complaint for appellate review.  See id.  

Graves also contends that the decree’s “omitted
property” provision should be eliminated because it “does not limit its effect
to community property, and therefore may award omitted separate property to the
other spouse in violation of Texas Family Code § 7.001.”  Graves contends that
there “was no opportunity for either party to disclose property that came into
being” between “the close of evidence” on January 28, 2008 and April 16, 2008
when the trial court signed the divorce decree.  Graves challenged the omitted
property provision in her post-trial motions.  

The omitted property provision provides: “Any
property or asset omitted from a party’s inventory and appraisement or
otherwise not fully disclosed to the opposing party is awarded to such opposing
party, to the extent of such omission, based on the greater of the valuation of
such property on the date of divorce or the date of discovery of the asset by
the aggrieved party.” 

In a divorce decree, “the court shall order a
division of the estate of the parties . . . having due regard for the rights of
each party.”  Tex. Fam. Code Ann. § 7.001.  In making its division, the trial
court may not divest one party of his separate property.  See Cameron v.
Cameron, 641 S.W.2d 210, 215 (Tex. 1982); Osborn v. Osborn, 961
S.W.2d 408, 414 (Tex. App.—Houston [1st Dist.] 1997, writ denied). Indeed,
divestiture of separate property by the trial court is contrary to the Texas
Constitution.  See Cameron, 641 S.W.2d at 213; Anderson v. Anderson,
282 S.W.3d 150, 155 (Tex. App.—El Paso 2009, no pet).  Separate property
commands constitutional stature: All property, both real and personal, of a
spouse owned or claimed before marriage, and that acquired afterward by gift,
devise or descent, shall be the separate property of that spouse.”  Tex. Const.
art. XVI, § 15; Zagorski, 116 S.W.3d at 316.  Only community property is
subject to the trial court’s just and right division.  Osborn, 961
S.W.2d at 413-14.

We agree with Graves that the trial court erred by
including the omitted property provision in the divorce decree to the extent
that the provision has or may have the effect of awarding one spouse’s separate
property to the other spouse.  Accordingly, we sustain Graves’s seventh issue and
remand for further consideration in conjunction with the trial court’s just and
right division.  Accordingly, we sustain Graves’s seventh issue.  

II.              
Tomlinson’s Cross-Appeal

We now address Tomlinson’s cross-appeal. 

A.        Sufficiency of
the Evidence

In his second issue, Tomlinson raises ten sub-issues
challenging the legal and factual sufficiency of the evidence supporting
numerous jury findings adverse to him.  All of the findings challenged by
Tomlinson are governed by the preponderance of the evidence standard, and we
apply the same sufficiency and preservation standards discussed above in
connection with Graves’s appeal.[10]


1.      Fair
market value 

In his first and second sub-issues, Tomlinson argues
that no evidence was presented at trial regarding “the fair market value of any
cattle, horses, or farm equipment” in Tomlinson’s possession to support the
jury’s finding in Question number 4 that the value of the cattle and horses was
$170,000 and the value of the farm equipment was $335,000.  Tomlinson argues
that Graves’s expert, Eric Brast, “testified as to value, but not as to fair
market value.” 

At trial, Brast valued the cattle at $208,300, the
horses at $25,950, and the farm equipment at $486,650.  Tomlinson’s attorney asked
Brast: “Now, you’ve given some pretty large numbers, haven’t you, sir?  And
your opinions here have been good sized numbers, haven’t they?” Brast
responded, “They’re fair estimates of fair market value, sir.”  Brast also
stated, “I have real-time market values for the animals.”  When discussing the
value of cattle semen, Brast testified, “I gave it a fair market value for
properly managed semen.”  When asked to summarize his Executive Summary, Brast
stated, “The Executive Summary reiterates the values that I found to be the
appraised values, fair market values, of those animals and equipment at that
point in time.”   

 

During his testimony, Brast did not continuously invoke
the term “fair market value.”  After reviewing Brast’s testimony in its entirety,
we nonetheless conclude the jury reasonably could have concluded that Brast’s
valuation of the cattle, horses, and farm equipment was based on fair market
value.  Accordingly, we conclude that there was sufficient evidence as to the
fair market value of cattle, horses, and farm equipment.  We overrule
Tomlinson’s sub-issues one and two.

2.      Purchase
of Rosenberg building

In his third sub-issue, Tomlinson contends that the
jury erred in failing to find that Graves committed fraud with respect to the
purchase by Graves’s son, Charles Babb, of a building located at 1117 Lawrence
in Rosenberg, Texas.  Tomlinson contends that: (1) the evidence conclusively
established that Graves committed fraud; and (2) the jury’s failure to find that
Graves committed fraud “possibly result[ed] in the erroneous exclusion of
$200,000 from reimbursement by Sandra Graves to the community estate.” 
Tomlinson claims that Graves provided Charles with $200,000 to purchase the
Rosenberg building in his name.

At trial, Graves testified repeatedly that she did
not help Charles buy the Rosenberg building and did not “give him any money
through any type of transfer, back-door transfer, front-door transfer, through
All The Little Things Country, cash, whatever.” Graves testified that Charles’s
father and uncles helped Charles buy the building.  Graves acknowledged that
All The Little Things Country uses the Rosenberg building free of charge, and
that All The Little Things Count pays taxes and insurance on the building.  

Graves testified that she gave Charles a $2,000 check
in lieu of paying him for work he performed, and that Charles used the check as
earnest money to purchase the Rosenberg building.  Graves also testified that (1)
she gave Charles’s father a check for $70,189.02 to pay for work he had
performed for Graves; and (2) Charles’s father “wanted the money used for
Charlie to buy the building.”  Graves testified that “what [she] wanted the
jury to understand was — is that we bought the building for the clients but
that [she] didn’t directly give the money to [her] son to buy that building.”

Charles testified that Graves gave him a $2,000 check
he used as earnest money to purchase the building; he also stated the $2,000
check “was payment, which was owed to me for working.”  Charles testified that
he met with his mother on the day of closing and that she gave him $200,000 in
cashier’s checks; he also testified that he received $200,489.94 to pay for the
Rosenberg building from his father and his father’s side of the family.  Charles
testified that Graves has never given him a gift in excess of $5,000.  Charles denied
that he is holding the building for Graves’s benefit until the divorce is over
“to keep [Tomlinson] from getting any part of it.”

Based on the record before us, we reject Tomlinson’s assertion
that the evidence conclusively establishes that Graves committed fraud with
respect to the purchase of the Rosenberg building.  The record contains
conflicting testimony, and the jury is the sole judge of the credibility of the
witnesses and the weight to be given to their testimony.  See Golden Eagle
Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).  We overrule
Tomlinson’s third sub-issue.

3.      $100,000
payment to Graves’s father

In his fourth sub-issue, Tomlinson argues that the
jury erred in failing to find that Graves committed fraud with respect to a $100,000
payment she made to her father during the marriage in June 2003.  Tomlinson
argues that the jury’s failure to find fraud “possibly” resulted “in the
erroneous exclusion of $100,000 from reimbursement by Sandra Graves to the
community estate.”

In support of his fourth sub-issue, Tomlinson states as
follows: “In June 2003 Sandra Graves paid her father $100,000 to reimburse him
for all of the money he had given her during her days as a single mother and
prior to her marriage to Michael Tomlinson.  This evidence conclusively
establishes a separate property debt paid with community property.” 

The jury charge defined fraud as follows: “A spouse
commits fraud if that spouse transfers community property or expends community
funds for the primary purpose of depriving the other spouse of the use and
enjoyment of the assets involved in the transaction.  Such acts involve
dishonesty of purpose or intent to deceive.”

Graves’s $100,000 payment to her father “to reimburse
him for all of the money he had given her during her days as a single mother
and prior to her marriage to Michael Tomlinson” may establish that Graves
repaid a separate property debt during her marriage.  It does not, however,
conclusively establish fraud because it does not establish that Graves expended
“community funds for the primary purpose of depriving . . . [Tomlinson] of the
use and enjoyment of the assets involved in the transaction.”

Accordingly, we overrule Tomlinson’s fourth
sub-issue.

4.      Fraud
or waste relating to horses, cattle, and farm equipment

In his fifth, sixth and seventh sub-issues, Tomlinson
asserts that the jury erred in finding he committed constructive fraud or waste
with respect to his and Graves’s community property rights relating to horses,
cattle, equipment, and implements.  Tomlinson contends that the only testimony
as to Tomlinson’s waste came from Graves’s expert, Eric Brast.  Tomlinson argues
that, because Brast had seen “these items on one occasion, November 10, 2007,” and
“did not testify as to how long Michael Tomlinson had been in possession of
these three items or their condition at any time prior to this one day of
viewing the cattle, horses, and farm equipment[,]” it was impossible for “Brast
to determine that these three items had diminished in value.”  

Brast testified at trial that the waste totaled $9,900
with respect to the cattle; $19,000 with respect to the horses; and $20,308
with respect to the equipment.  Brast attributed the loss in the value of the
animals to poor animal husbandry practices, and opined that waste would not
have occurred but for the acts of Tomlinson.  Brast testified that some of the
horses had halters growing into their flesh.  He testified that the horses were
malnourished.

Brast estimated that the equipment’s value declined
by four percent because it was left unsheltered, was not covered with a tarp,
and was not maintained.  Brast stated, “I only saw the equipment that I was
shown by Mr. Tomlinson but the equipment was unshedded, outdoors, grown up in
weeds.  No one had made an effort to try to protect the equipment.  It didn’t
look as though it had been maintained, as far as greasing equipment, greasing
disks, trying to keep coulters on disks moving so that they work when you
actually go to try to put them in the ground and plant something.  It looked in
a state of mismanagement at best.” 

Brast testified that Tomlinson had a responsibility
to tell him about any “unique” or “important” information, and that Tomlinson also
had a responsibility to inform Brast if equipment was functional, especially
because some of the equipment was “exceedingly hard to get to because of the
way [it] had been taken care of.”  To illustrate Tomlinson’s mismanagement and
poor animal husbandry practices, Brast showed the jury several photos of the
cattle, horses, and equipment.

Tomlinson does not deny responsibility for the
condition of the animals or the equipment; rather, Tomlinson defends the
condition of the animals and equipment.  To explain the condition of the horses,
Tomlinson stated that they were pasture horses that were supposed to live off
the land.  He testified that Brast did not understand that his horses were
pasture horses rather than stalled horses, and that he hasn’t “neglected
anything.”  Tomlinson also testified that the horses in Brast’s pictures did
not look starved.  With respect to the cattle, Tomlinson disagreed with Brast
and stated that his cattle are in “excellent shape.”  He also testified that
one cannot build barns to store equipment on leased land, and that it is
customary to leave equipment “out in the open.” 

Tomlinson never asserted that the equipment and
animals at issue were in someone else’s care during the divorce proceedings.  Nor
does Tomlinson claim that Brast’s conclusion of waste is unreliable or
questionable because the animals and equipment had been in the same or similar
condition during the marriage or during the divorce proceedings.  Brast’s testimony
presented sufficient evidence supporting the jury’s finding that Tomlinson
committed constructive fraud or waste.  We overrule Tomlinson’s fifth, sixth,
and seventh sub-issues.

5.      Funds
from farming and ranching operations 

In his eighth sub-issue, Tomlinson contends that
there is factually insufficient evidence to support the jury’s finding that he
committed constructive fraud or waste in the amount of $767,000 with respect to
his and Graves’s community property rights in the farming and ranching operations.

Because Tomlinson did not file a motion for new
trial, he is precluded from asserting a challenge to the factual sufficiency of
the evidence.  See Tex. R. Civ. P. 324(b)(2); Cecil, 804 S.W.2d
at 510.  On appeal, Tomlinson briefed only a factual sufficiency challenge; he does
not challenge the jury’s finding on legal sufficiency grounds.  Accordingly, we
overrule Tomlinson’s eighth sub-issue.

6.      Transfer
of assets to All The Little Things Country

In his ninth sub-issue, Tomlinson argues that the
jury erred by finding that Graves did not commit constructive fraud or waste by
transferring assets from her proprietorship and LLC to the non-profit
corporation All The Little Things Country.  He contends that the evidence
conclusively establishes that Graves committed fraud or waste with respect to
these transfers.  Tomlinson does not specify any particular assets in
connection with this argument. 

Tomlinson asserts that the following evidence conclusively
shows Graves committed fraud or waste: 

It is undisputed that the two
for-profit companies would submit invoices to the State of Texas for services
which it would certify were performed by the for-profit companies.  All the
Little Things Country (a non-profit corporation) would then send a monthly bill
to All The Little Things Count (without distinguishing between the sole
proprietorship or the LLC)  . . . .  Occasionally, All the Little Things Count
would send a bill to itself.  There was no evidence that All the Little Things
Country (a non-profit corporation) did anything but invoice the for-profit
companies.  . . . Charity is a wonderful thing except Sandra Graves arranged
for the All the Little Things Country (a non-profit corporation) to benefit
Sandra Graves as it was convenient.  For example, her son drove the All the
Little Things Country (a non-profit corporation)’s Ford Expedition for his
personal use.

At trial, Graves testified
that All The Little Things Country has several facilities providing services for
All The Little Things Count; All The Little Things Count, LLC; Volunteers of
America; the Gulf Coast Mental Retardation Authority; the Harris County Mental
Retardation Authority; and other entities.  All The Little Things Country has
its own employees and pays these employees on its own.  All The Little Things
Country bills for the services it provides to All The Little Things Count and
All The Little Things Count, LLC.  

All The Little Things Count and All The Little Things
Count, LLC transferred several vehicles to All The Little Things Country, and
Graves testified that this transfer of assets constituted compensation for
services rendered.  In particular, Graves testified that “those vehicles were
transferred over to Country; but it was deducted off the invoice that was owed
to Country.  Instead of being paid in dollars, we paid them in vehicles because
they’re the ones who needed the vehicles.” 

The court-appointed auditor, Bryan Rice, also testified
regarding several transactions between All The Little Things Count, All The
Little Things Count, LLC and All The Little Things Country.  In response to a
question from Graves’s attorney asking whether he found any transfers between
these entities to be improper, Rice testified: “I found them to be routine,
something that had been going on since 2000, and I saw nothing improper about
it.”  Rice also stated that “money was transferred to Country, the reason
being, Country provides services to Count.”

There is no evidence in the record that Graves’s son
drove a Ford Expedition at any time; nor does the record establish that such a
vehicle was ever owned by All The Little Things Country.

In light of the record before us, we conclude that
legally sufficient evidence supports the jury finding that Graves did not
commit fraud or waste with regard to any asset transfers to All The Little
Things Country.  Furthermore, the evidence does not conclusively show Graves
committed fraud or waste.  We overrule Tomlinson’s ninth sub-issue.

7.      Attorney’s
fees

In his tenth sub-issue, Tomlinson contends that the
jury’s failure to find that Graves committed fraud or waste in the payment of
attorney’s fees “possibly result[ed] in the community estate not being
reimbursed by Sandra Graves in the amount of $460,000 ($1,000,000 less
$540,000).”  In support of his sub-issue, Tomlinson states the following in his
brief:

Bryan Rice noted $199,797.83 in expenditures from All the
Little Things Count to pay Sandra’s non-business attorney fees and other
professional fees related to this divorce from the time of filing on June 14, 2005
to March 1, 2006.  Gregory R. Schuelke testified that for the first eleven
months of 2007 Sandra Graves spent $353,801 in non-business attorney fees and
other professional fees related to this divorce.  The two together exceed
$550,000 and does not include ten months in 2006, one month in 2007, or the
trial.  

The Trial Court found as a fact that Sandra Graves paid
attorneys and expert witnesses in this cause in excess of one million dollars
($1,000,000) and that this was a violation of and a contempt of the Court’s
Temporary Orders.  (citations to record omitted).

This evidence does not
establish that Graves committed constructive fraud or waste because it does not
establish that Graves’s expenditures were “capricious, excessive or arbitrary
resulting in unfairness to” Tomlinson as required by the jury charge.  Accordingly, we overrule Tomlinson’s second
issue.

8.      Tomlinson’s
debt to his parents

In his fourth issue, Tomlinson argues that there is legally
and factually insufficient evidence to support the jury’s finding that he committed
constructive fraud or waste “with respect to his and Sandra’s community
property rights by incurring indebtedness and encumbering community property in
favor of his parents, possibly resulting in the erroneous reimbursement by
Michael Tomlinson of the community estate in the amount of $239,000.”

The trial court granted Tomlinson’s motion to
disregard the jury’s answer in Question Eleven, which asked, “Did MIKE commit
constructive fraud/waste with respect to his and Sandra’s community-property
rights by incurring indebtedness and encumbering community property in favor of
his parents?”  Therefore, the jury’s finding was not a part of the formation of
the divorce decree.  The jury’s finding could not have “possibly result[ed] in the
erroneous reimbursement by Michael Tomlinson of the community estate in the
amount of $239,000.”  Tomlinson acknowledges this in his brief: “The Trial
Court used its authority . . . to determine that Michael’s indebtedness to his
parents was a bona fide debt and not a fraud on the community estate;
therefore, not subject to reimbursement.”

Accordingly, we overrule Tomlinson’s fourth issue.

B.        Charge
Error

In his third issue, Tomlinson complains that the
trial court erred by refusing to submit “an issue on combining the value of All
the Little Things Count, L.L.C. and All the Little Things Country (a non-profit
corporation) to the extent the later is used by Sandra Graves to reduce
[Tomlinson]’s interest in the community estate as tendered by Michael Tomlinson.” 
In support of his assertion that the trial court erred by refusing to submit
his proposed jury question, Tomlinson states in his brief: “There was more than
a scintilla of evidence of the co-mingling of the assets including the income
of All the Little Things Count, L.L.C. to justify the submission of such
Question to the Jury.”  

A party is entitled to a jury question, instruction,
or definition if the pleadings and evidence raise an issue.  Tex. R. Civ. P.
278; Union Pac. R.R. Co. v. Williams, 85 S.W.3d 162, 166 (Tex. 2002).  The
goal of the jury charge is to submit to the jury the issues for decision
logically, simply, clearly, fairly, correctly, and completely.  Hyundai
Motor Co. v. Rodriguez, 995 S.W.2d 661, 663-64 (Tex. 1999).  Toward that
end, the trial court enjoys broad discretion so long as the charge is legally
correct.  See id.  

A judgment will not be reversed for charge error unless
the error was harmful because it probably caused the rendition of an improper
verdict or probably prevented the party from properly presenting the case to
the appellate courts.  Columbia Rio Grande Healthcare, L.P. v. Hawley,
284 S.W.3d 851, 856 (Tex. 2009). Charge error is generally considered harmful
if it relates to a contested, critical issue.  Id.

Tomlinson does not cite any authority to support his
assertion that the trial court erred by refusing to submit his proposed
question to the jury.  We conclude that Tomlinson has waived this issue by
failing to provide sufficient argument and analysis.  See Tex. R.
App. P. 38.1(i).  We overrule Tomlinson’s third issue.  

Conclusion

We affirm the portion of the trial court’s divorce
decree granting the divorce.  We reverse the portion of the trial court’s
divorce decree imposing sanctions against Graves and remand the case for
further proceedings with respect to sanctions consistent with the standards
discussed in this opinion.  We reverse the portion of the decree dividing the
marital estate and remand the case to the trial court to conduct a just and
right division in light of this court’s determination that (1) $134,000 in farm
and ranch equipment cannot be characterized on this record as Tomlinson’s
separate property; and (2) the omitted property provision is improper as
written.  

We affirm the trial court’s judgment awarding fees in
favor of the court-appointed auditor Bryan Rice, and the firms Hartman Leito
& Bolt, LLP, and Rice Stewart Faris & Co.








 

                                                                        /s/        William
J. Boyce

                                                                                    Justice

 

 

 

Panel consists of Justices Frost,
Boyce, and Sullivan (Sullivan, J., not participating).

 









[1]
We need not address Graves’s argument that Tomlinson’s Amended Inventory and
Appraisement constitutes a judicial admission that the listed farm and ranch
equipment is community property.





[2] 
A party who preserves a legal sufficiency
challenge by a motion for new trial is entitled at most to a remand rather than
rendition of judgment on appeal.  Brown v. Traylor, 210 S.W.3d 648, 659
(Tex. App.—Houston [1st Dist.] 2006, no pet.); see also Horrocks v. Tex.
Dep’t of Transp., 852 S.W.2d 498, 499 (Tex. 1993).

 





[3] 
In the trial court, Graves challenged the legal
sufficiency of the evidence supporting the jury’s valuation of All The Little
Things Count, LLC; she did not challenge the legal sufficiency of the evidence
supporting the jury’s valuation of the sole proprietorship All The Little
Things Count.  Therefore, we do not address the legal sufficiency of the
evidence to support the jury’s valuation of the sole proprietorship.  See
T.O. Stanley Boot Co., 847 S.W.2d at 220-21; Cecil, 804 S.W.2d at
510-11.  Similarly, because Graves’s motion for new trial does not challenge
the factual sufficiency of the evidence supporting the jury’s valuation of the
sole proprietorship, we do not address this issue on appeal.  See Tex.
R. Civ. P. 324(b)(2); Cecil, 804 S.W.2d at 510.

 





[4] 
Palmer used a 97 percent multiple under the guideline public company method and
a 63 percent multiple under the comparable transaction method.  Applying
Palmer’s 97 percent multiple to the LLC’s income of $5,000,477 results in a
value of approximately $4,850,000 under the market approach.  Applying Palmer’s
63 percent multiple to the LLC’s income results in a value of approximately
$3,150,000 under the market approach.





[5]
The jury charge did not provide a separate instruction on or definition of waste.
 Case law states that “[w]aste occurs when one spouse, dishonestly or
purposefully with the intent to deceive, deprives the community estate of
assets to the detriment of the other spouse.”  Giesler v. Giesler, No.
03-08-00734-CV, 2010 WL 2330362, at *3-*4 (Tex. App.—Austin June 10, 2010, no
pet.) (mem. op.).





[6]
Though the trial court erred in making the sanctions award in the form that it
did, we do not address the substance of the sanctions order or the propriety of
assessing sanctions based on the conduct to which the trial court referred.





[7]
Graves also stated, “And, as explained under Issue Number Three, the sanction
award, if it is allowed at all, should be reduced to $349.25, if not zero.”  In
light of our disposition of Graves’s third issue, we need not address her
assertion with respect to the sanctions award.





[8]
The farm and ranch equipment was valued at $335,000.  Forty percent of $335,000
equals $134,000.





[9]
Graves also argues that auditor Bryan Rice
“accepted work under this agreed order, acknowledged the 50/50 split set out in
this Order, and even secured a money judgment based on the Order;” therefore,
Graves contends that Rice is bound by the order on quasi estoppel grounds under
Stable Energy, L.P. v. Newberry, 999 S.W.2d 538, 548 (Tex. App.—Austin
1999, pet. denied).  We do not address Graves’s quasi estoppel argument because
it was not raised in the trial court.  See Tex. R. App. P. 33.1.

 





[10]
Tomlinson’s first issue focused on judicial estoppel, which is inapplicable for
reasons already discussed.