Michal PELZIG, Appellant,

v.

Alan BERKEBILE, Appellee.

No. 13–94–00561–CV.

Court of Appeals of Texas,
Corpus Christi.

Oct. 17, 1996.

Deborah Sundermann, Corpus Christi, for Appellant.

Lola L. Bonner, Rockport, for Appellee.

Before SEERDEN, C.J., and CHAVEZ and YANEZ, JJ.

## OPINION

CHAVEZ, Justice.

The controversies in this case center on the treatment of various assets held by Michal Pelzig and Alan Berkebile at the time of their divorce. Appellant Pelzig challenges the court's valuation and distribution of the parties' assets. Pelzig's fourth point of error asserts generally that the trial court abused its discretion in dividing the community estate, a theory which is asserted more specifically in Pelzig's other points of error. Pelzig's first point of error alleges error in the trial court's refusal to grant her claim for reimbursement for funds paid to Berkebile's former wife and his daughter by his first wife. Pelzig's next two points of error allege

that the court used the wrong method of calculating the community interest in Berkebile's retirement funds, and thus the resulting division of those funds was incorrect. Point of error five argues that the court's valuation of the parties' home, each of their two cars, Berkebile's retirement funds, Pelzig's stock options from a former employer, and various bank and life insurance accounts was against the great weight and preponderance of the evidence. Point of error six argues that the trial court erred by failing to use figures that were current at the day of the trial, and Pelzig's final point of error alleges that the trial court incorrectly found that the parties had agreed that the division of household goods was a "fair and equitable division."

The parties were married on November 17, 1979, and their divorce was adjudged on February 4, 1994, although the court took the property division issues under advisement until the Final Decree of Divorce was signed on August 25, 1994. Berkebile had been married before and had one adopted daughter from that marriage. Berkebile retained various financial obligations from that marriage when he entered the marriage with Pelzig, and also had acquired some separate property. Pelzig initiated these divorce proceedings, and has now appealed the trial court's distribution of the parties' property.

Pelzig's Reimbursement Claim

Pelzig claims reimbursement of her share of the community interest sent to Berkebile's former wife and his daughter. Pelzig sought reimbursement for the following expenditures: mortgage payments for his former wife's house totalling $54,435.41, alimony totalling $8,794.00, child support totalling $9,089.19, college costs of his daughter totalling $18,183.19, and legal fees from his first divorce totalling $2,229.50. Pelzig characterizes these payments as relieving the duties of Berkebile's separate estate. Berkebile characterizes these payments as "living expenses," for which no reimbursement is allowed.

■ Whenever a party challenges a trial court's division of property upon divorce, we review the trial court's actions according to an "abuse of discretion" standard. *Murff v. Murff,* 615 S.W.2d 696, 700 (Tex.1981). The right of reimbursement is an equitable right that arises when the community estate is used to benefit the separate estate of one of the spouses without the community estate receiving a benefit. *Vallone v. Vallone,* 644 S.W.2d 455, 458–59 (Tex.1983).

■ The cases which exempt "living expenses" from reimbursement all deal with claims for separate property expended by one spouse for the living expenses of the married couple and their family. *See Penick v. Penick,* 783 S.W.2d 194 (Tex.1988); *Norris v. Vaughan,* 152 Tex. 491, 260 S.W.2d 676 (1953); *Kotrla v. Kotrla,* 718 S.W.2d 853 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). The child support, college expenses, and alimony payments were legal obligations Berkebile brought with him into the marriage. There is no evidence that Pelzig was deceived about these obligations. There is no evidence that Pelzig ever sought to require Berkebile to meet these obligations out of his separate estate, either during their marriage or in the form of a prenuptial agreement. There is no evidence that these expenses benefitted Berkebile's separate estate. The trial court, therefore, did not abuse its discretion in equitably determining that no right of reimbursement attaches to these payments.

■ The payments for attorney's fees also appear to have been made with Pelzig's full knowledge and tacit consent. While these payments may not have been strictly obligatory in the sense that the court-ordered payments to Berkebile's first wife and his daughter were, it should be remembered that spouses are free to make expenditures of community property absent some deception or objection by the other spouse. *Mazique v. Mazique,* 742 S.W.2d 805, 808 (Tex. App.—Houston [1st Dist.] 1987, no writ); 39 Tex. Jur.3d *Family Law* § 223 (1994). Thus, there is no evidence that this expenditure benefitted Berkebile's separate estate. Accordingly, we hold that the trial court did not abuse its discretion in denying Pelzig's claim for reimbursement for Berkebile's legal fees.

■ Of the expenditures for which Pelzig seeks reimbursement, only the payments for the New York house yielded value to Berkebile's separate estate. Pelzig is entitled to reimbursement for her share of the community funds that went toward the mortgage, tax, and insurance for the New York house. Therefore, Pelzig's first point of error is sustained, but only as far as it pertains to her reimbursement claim for expenditures for the New York house.

■ Measurement of the reimbursement claim should be guided by *Penick v. Penick,* 783 S.W.2d 194 (Tex.1988). That case dealt with the use of community funds to extinguish a prenuptial purchase money debt. The Texas Supreme Court held that the community reimbursement claim should be measured according to the enhancement of value of the separate estate, subtracting any benefit to the community estate. *Id.* at 196–98, citing *Anderson v. Gilliland,* 684 S.W.2d 673, 675 (Tex.1985). Appellant urges that, to find the amount the couple saved on their taxes by being able to deduct the mortgage interest, the amount deducted from taxable income should be multiplied by the applicable tax rates. We believe appellant states the correct formula. Appellee's formula, which would offset the reimbursement by the full amount of the deduction from taxable income, overstates the tax savings by assuming that a dollar deducted from taxable income is a dollar saved. Appellee leaves out the fractional tax rates that determine how much of taxable income will actually be paid (or saved) in taxes.

We sustain in part appellant's point of error one, holding that appellant was entitled to reimbursement for expenditures from the community estate on the New York house, but no reimbursement is merited on the other expenditures.

### Retirement Accounts

Pelzig alleges that the trial court erred in failing to use the most current figures available in determining the value of the retirement accounts from Berkebile's employment as a university teacher, and that the trial court used the wrong formula in separating the accounts into separate and community property.

■ When Pelzig and Berkebile married, Berkebile had been contributing to two retirement accounts, one an annuity account and the other a stock holding fund, for fifteen years. The accounts were funded by contributions from Berkebile that were supplemented by corresponding contributions from Berkebile's employer. When Berkebile and Pelzig married, the accounts held $31,912.27. The proper value of the accounts at divorce is disputed. The trial court used a figure from an account statement that quoted the value as of September 30, 1993 at $356,012.45. Pelzig urges that the trial court was obligated to use numbers that were current as of the day of the divorce. Pelzig offered her own estimates regarding the growth of those funds at the day of the divorce trial, February 4, 1994. Pelzig's total was $375,370. Berkebile argues that Pelzig's numbers are merely self-serving estimates, and that the trial judge, as the finder of fact, was entitled to weigh the credibility of the evidence presented, and did not abuse its discretion by choosing Berkebile's more certain (though older) numbers over the more speculative figures provided by Pelzig.

■ When a couple divorces prior to retirement, the value of retirement benefits are determined as of the date of divorce. *May v. May,* 716 S.W.2d 705, 710 (Tex.App.—Corpus Christi 1986, no writ); citing *Berry v. Berry,* 647 S.W.2d 945 (Tex.1983). In this case, most of Pelzig's figures for the retirement funds were based on statements from July, 1993, which Pelzig then projected to the date of trial. Pelzig projected a growth of the funds of approximately $25,000, from $350,000 in July, 1993 to $375,000 in February, 1994. Pelzig also testified that she placed a telephone call during a recess from the trial to one of representatives of one of the funds, and that she subsequently made a small adjustment to her projection based on the figure she obtained from that phone call. Berkebile's evidence of the value of the retirement funds consisted of the September 30, 1993 figures that the court adopted. Pelzig never challenged the accuracy or authen-

ticity of Berkebile's figures, only that they were not the most current numbers available.

It is the trial court's province to judge the credibility of evidence and to resolve conflicts in testimony. *Ford v. Panhandle & Santa Fe Ry. Co.*, 151 Tex. 538, 252 S.W.2d 561, 563 (1952). In evaluating the trial court's findings of fact, we must give substantial deference to the trial court's determination of the weight and credibility of the evidence, and only disturb the trial court's findings in a case of clear abuse. *Murff*, 615 S.W.2d at 700. We find no such clear abuse here. The trial court may have been troubled that Pelzig's projections, although purported to be more current, were not substantiated by any documentation to bolster their credibility. Certainly it was within the trial court's discretion to distinguish a figure from among the conflicting evidence. Appellant's points of error five and six, in so far as they pertain to the trial court's valuation of the retirement funds, are overruled.

There remains the issue of the trial court's approach to dividing the retirement funds into separate and community property. The trial court followed the formula articulated in *Berry*, 647 S.W.2d at 946–47 (Tex.1983). *Berry* involved a similar situation in that the employee had begun work with his employer prior to marriage and was still working for that employer at the time of divorce. However, *Berry* involved a "defined benefit" retirement plan, wherein the benefit is based on the number of years of service the employee has at the time of retirement, along with other factors such as age and salary history. The employee does not contribute any funds toward his retirement in a defined benefit plan. When evaluating the community's share of a defined benefit plan, the correct approach to determining the community share of the fund was to take the fraction of the total months of the employee's tenure that had coincided with the marriage and divide that number by the total number of months worked. *Id.* at 946–47. That fraction would then be multiplied by the value of the retirement benefits to find the community's share. *Id.*

In this case, Berkebile's benefits were not controlled by the employee's length of service, but by the amount of money Berkebile put into the retirement plans. In contrast to a "defined benefit" plan, Berkebile had a "defined contribution plan." Two appellate courts that have considered defined contribution plans have held the *Berry* formula inapplicable. *Hatteberg v. Hatteberg*, 933 S.W.2d 522, 531–532 (Tex.App.—Houston [1st Dist.] no writ); *see Iglinsky v. Iglinsky*, 735 S.W.2d 536, 538 (Tex.App.—Tyler 1987, no writ); In both of those cases, the appellate courts simply subtracted the pre-marriage sum from the sum at divorce to determine the portion that was added during marriage and therefore is community property. In this case, the portion of community funds can be determined by taking the figure the trial court found to be the value of the funds at the time of divorce, $356,072.45, and subtracting the amount already in place at the time of marriage, $31,912. The $31,-912 is the only amount that represents separate property. The rest of the fund consists of income to Berkebile during the marriage and interest on the accumulated funds that accrued during marriage, both of which qualify as community property. TEX. FAM. CODE ANN. § 5.01 (Vernon 1993).

Therefore, we hold that the trial court abused its discretion in applying the *Berry* formula to the retirement benefits in this case. Appellant's points of error two and three are sustained.

## The Rockport House

Pelzig alleges that the trial court's valuation of the Rockport house at $99,000 was contrary to the great weight and preponderance of the evidence, and that the trial court's finding that the lien against the house was for $80,000 was not a date-of-divorce determination. The evidence in this case included a variety of estimates of the house's value. One appraiser set the value at $115,-000. A local real estate agent was reported to have estimated the market value at $105,-000–$110,000. The parties agreed that clos-

ing costs on a sale of the house would reduce the value by approximately ten percent.

There was conflicting testimony regarding the treatment of a membership to Rockport Country Club, which the parties acquired as part of their purchase of the house. Some testimony indicated that the country club memberships were customarily sold along with the houses in the country club subdivision where the house was located. Yet other testimony suggested that the appraisal values were determined irrespective of the value of the country club membership. The judge chose to include the membership in her assessment of the house's value. The judge's finding of a $99,000 value after deducting ten percent for closing costs was within the range of values suggested by the evidence. We see no abuse of discretion in this finding.

Pelzig placed into evidence a document from the mortgage company that indicated the outstanding lien on the house as of October 25, 1993 to be $79,986. Pelzig testified that just prior to trial she phoned the mortgage company and was quoted a figure of $79,150, valid as of February 1, 1994. Berkebile presented an exhibit, summarizing the values he considered correct, which put the lien at $80,000. We do not believe the trial court abused its discretion in finding the value of the lien to be $80,000. As with Pelzig's testimony regarding the value of the retirement homes, the trial court may have reasonably determined to follow the slightly older figures which were better supported by documentation. The discrepancies between the figures presented also has a de minimis quality, which further discourages us from disturbing the trial court's discretion regarding these findings. *See, e.g., McElwee v. McElwee,* 911 S.W.2d 182, 189 (Tex.App.— Houston [1st Dist.] 1995, n.w.h.) (mistake in property division at divorce which has de minimis effect on the overall division not reversible error)[1]. Appellant's points of error five and six, in so far as they pertain to the trial court's valuation of the Rockport house and the lien against it, are overruled.

## The Cars

Pelzig alleges that the trial court's findings regarding the value of the parties' cars was also contrary to the great weight and preponderance of the evidence, and that the trial court's finding regarding the amount of the lien against one of the cars was not determined as of the date of divorce. The parties had two cars, a 1987 Toyota Camry, which the parties owned outright, and a 1993 Ford Thunderbird, which had a lien against it.

Pelzig offered evidence taken from the N.A.D.A. "Blue Book" that the value of the Thunderbird was $13,100. Berkebile offered his opinion that the value of this car was $13,750. The trial court adopted the $13,750 figure. As the Thunderbird was awarded to Berkebile and its value charged against his portion of the property division, any overestimation of its value was a benefit to Pelzig and did not produce any harm that might require reversal.

The lien against the Thunderbird was assessed by Berkebile to be $12,192. Berkebile arrived at this number by multiplying the monthly payment by the number of payments remaining. Pelzig presented a letter from the lienholder that stated the outstanding debt at $11,311.79 as of October 25, 1993. She testified that she made a phone call to the lienholder on February 1, 1994, and was told that as of that date the balance was $10,325. The trial court accepted Berkebile's sum of the remaining scheduled payments as the proper assessment of the lien.

We believe the trial court erred in calculating the amount of the lien against the Thunderbird. Berkebile's calculation, which the trial court adopted, improperly included the portion of the monthly payments that represents interest rather than equity. Berkebile argues that since most car owners elect to pay for new cars through monthly

---

1. Examination of the values assessed in the trial court's findings of fact reveals that Pelzig received a larger portion of the overall community property division than Berkebile. Nowhere does the trial court indicate that it intended to split the community property according to any particular percentages, such as fifty percent to each. Under these circumstances, it seems particularly likely that an error of no more than $850 would have only a de minimis effect on the overall division.

payments, basing the calculation on the monthly payments was appropriate. We are unpersuaded. The fallacy of this approach is obvious if one considers its application to a thirty year mortgage on a house. A homeowner who had only been making payments for a few years would frequently face remaining payments far in excess of the purchase price, yet the lien amount is still considered to have been reduced by the portion of the mortgage payments already made that represented principal. Similarly, adding together Berkebile's remaining payments does not present an accurate view of the lien amount, since the payments include not just principal but also interest. We see no reason to follow a different approach to determining the amount of liens against automobiles than we use for liens against houses.

 Berkebile estimated the value of the Camry at $4500. Pelzig referred to the Blue Book, which quoted the Camry at $4925, from which she deducted $375 for a manual transmission and $2175 for high mileage, according to deduction tables in the Blue Book. Pelzig's final valuation was $2375. Berkebile's estimate does reflect a $400 reduction from the base Blue Book value, although this is a smaller reduction than that urged by Pelzig. The trial court found the value to be $4500. Here as in previous determinations, the trial court chose a figure within the range of the evidence presented. While the trial court's determination was contrary to some of the evidence, we do not believe the trial court's finding was against the great weight and preponderance of the evidence, nor that the trial court abused its discretion in making the factual determination to prefer Berkebile's estimate over the Blue Book.

We sustain appellant's challenge to the trial court's assessment of the lien against the Thunderbird, and overrule all other points of error pertaining to the findings of fact regarding the parties' cars.

### Pelzig's Stock Options

 The trial court found that the parties held community property worth $850 in the form of stock options from Pelzig's former employer, DuPont. Pelzig testified that, previously unbeknownst to her, the stock options had been lost due to her failure to exercise her options within three months of termination from that employment. Her testimony was supported by a document from DuPont explaining her rights and obligations regarding the stock options. She testified that, if the stock options were still viable, they would be worth $1500. Berkebile presented no evidence regarding the stock options, except to argue that since Pelzig had previously represented to Berkebile that the stock options were still available, but then claimed not to have them at the time of trial. The trial court could have reasonably assumed that she disposed of the stock options for her own private benefit.

We believe that the trial court's finding that the parties still owned valid stock options worth $850 was an abuse of discretion. Pelzig's testimony as to the loss of the stock options was supported by documentation from the issuer of the stock options and uncontroverted by Berkebile. We do not agree that a reasonable fact finder could have assumed that Pelzig disposed of the stock options for her private gain, when she presented neutral, uncontroverted evidence that the stock options had been lost. Appellant's challenge to the evidentiary support for the trial court's finding of the value of the stock options is sustained.

### The Cash Accounts and Life Insurance

 Pelzig challenges the trial court's findings on the values of the parties' Pacific Southwest checking account, the Northwestern Mutual Life Insurance account, and the four New England Life Insurance accounts. Pelzig challenges the sufficiency of the evidence to support the findings and alleges that they are not current as of the date of the divorce. Pelzig asserts that all of these assets were undervalued by the trial court. Berkebile correctly notes that all of these assets were awarded to Pelzig. If Pelzig were correct that the trial court undervalued these assets, the trial court's mistake would benefit Pelzig, since the higher, correct values were not charged against her portion of the community estate when the trial court made its division. As Pelzig has suffered no harm, there can be no reversible error. Ap-

pellant's points of error pertaining to the court's valuation of the cash and life insurance accounts are overruled.

## Household Items

 The parties had entered into an agreed division of their household possessions. The agreed division placed the total value at $30,646, with items worth $16,912 going to Berkebile and items worth $13,734 going to Pelzig. The trial court found that "[t]he [p]arties had agreed that the agreed division of personal property between them was fair and equitable." Pelzig now argues that, although the exact division of personal items was agreed to, she did not consider the overall division "fair and equitable," since Berkebile's items were of greater value. Pelzig argues that she should have been compensated for the $3178 shortfall in personal items out of other property in the community estate. Berkebile argues that the trial court, after reviewing all the evidence, found that the division of personal property was fair and equitable, and the trial court is entitled to sufficient deference to allow its finding to stand.

The trial court found that "*[t]he [p]arties had agreed* that the agreed division ... was fair and equitable" (Emphasis added). The evidence in this case shows only that the parties agreed to the division of personal property, not that they agreed that the division was fair and equitable. Rather, the inequality of the personal property division is reflected twice in the record, once in Pelzig's oral testimony and again in an exhibit admitted into evidence that itemizes the personal property division.

 However, the trial court awarded Pelzig a greater share of the remaining community property than was awarded to Berkebile. Nowhere does the trial court indicate an intention to divide the property according to a set percentage, such as fifty percent to each. Pelzig has failed to demonstrate how the trial court's determination of the agreed division of household items as "fair and equitable" has impacted the ultimate division of community property or harmed her in any way. Under these circumstances, no revers-

ible error has been committed. Appellant's seventh point of error is overruled.

We remand this case with instructions to the trial court to make a new division consistent with this opinion. *Jacobs v. Jacobs,* 687 S.W.2d 731, 733 (Tex.1985).