# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00517-CV

**Janet Rose Banister, Appellant**

**v.**

**Gregory D. Banister, Appellee**

### FROM THE 425TH JUDICIAL DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 20-0707-F425, THE HONORABLE BETSY F. LAMBETH, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Janet Rose Banister appeals from the district court's final decree of divorce. In six issues on appeal, Janet asserts that the district court (1) erred by finding that she breached her fiduciary duty to appellee Gregory D. Banister, committed fraud on their community estate, and wasted their community assets; (2) erred by characterizing certain real property acquired by Janet during the marriage as community rather than separate property; (3) incorrectly appraised other real property in the estate; (4) erred by excluding the testimony of a witness; (5) erred by failing to award Janet and Greg equal amounts of the proceeds of the sale of their marital residence; and (6) abused its discretion by failing to award Janet spousal maintenance.[1] For reasons that we explain below, we affirm the divorce decree.

---

[1] Because the parties share the same last name, we will refer to them as Janet and Greg for clarity and convenience.

## BACKGROUND

Janet and Greg married in 1996. On March 3, 2020, Greg filed a petition for divorce after he learned that Janet was having an affair with another man, Kevin Mikulencak. On April 9, 2020, Janet filed a counter-petition for divorce. Janet and Greg had three children together, two of whom were adults and one was fifteen years old at the time of the divorce, and they owned several rental properties, the values of which were a major source of contention during the divorce.

The case proceeded to a bench trial on April 8 and 15, 2021. Witnesses at trial, whose testimony we discuss below, included Janet and Greg; Koa Short, the person who purchased Janet and Greg's marital residence after they filed for divorce; Vance Powell, the real estate appraiser for Greg; Christopher Hogue, the real estate appraiser for Janet; and Janet's mother and brother, Virginia and John Debus, who testified about property that Janet had acquired during the marriage. At the conclusion of trial, the district court granted the divorce and advised the parties that it was granting most of the relief requested by Greg, including that it found that Janet had breached her fiduciary duty to Greg, committed fraud on the community estate, and wasted community assets. Later, the district court emailed the parties its property division. In its division, the district court valued the community estate at $3,993,630. Greg was awarded $1,972,629 in net assets, or 50.15% of the estate, while Janet was awarded $1,961,001 in net assets, or 49.85% of the estate.[2] Janet filed a motion for new trial and an amended motion for new trial, which the district court denied following a hearing. Subsequently, the district court signed its final divorce decree. This appeal by Janet followed.

---

[2] The district court also made findings regarding custody and control of Janet and Greg's minor child, but those findings are not at issue in this appeal and we need not discuss them here. *See* Tex. R. App. P. 47.1.

## STANDARD OF REVIEW

In a divorce, the trial court shall divide the estate of the parties "in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." Tex. Fam. Code § 7.001. We review a trial court's division of the marital estate for abuse of discretion, and the trial court has broad discretion in making its division. *See Penick v. Penick*, 783 S.W.2d 194, 198 (Tex. 1988); *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981); *Iliff v. Iliff*, 339 S.W.3d 126, 133 (Tex. App.—Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011); *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.) (*O'Carolan I*). Legal and factual sufficiency are relevant factors, rather than independent bases for reversal, in determining whether the trial court abused its discretion. *Iliff*, 339 S.W.3d at 134; *see Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). Thus, in determining whether the trial court abused its discretion, we consider whether the court had sufficient evidence upon which to exercise its discretion, and if so, whether it erred in the application of that discretion. *Coburn*, 433 S.W.3d at 823; *Zeifman*, 212 S.W.3d at 588.

Every reasonable presumption should be resolved in favor of the trial court's proper exercise of its discretion in dividing the parties' property. *Zieba v. Martin*, 928 S.W.2d 782, 791 (Tex. App.—Houston [14th Dist.] 1996, no writ). "We presume on appeal that the trial court correctly exercised its discretion when dividing property in a divorce proceeding, and the appellant bears the burden to show from the record that the division was so disproportionate, and thus unfair, that it constitutes an abuse of discretion." *O'Carolan v. Hopper*, 414 S.W.3d 288, 311 (Tex. App.—Austin 2013, no pet.) (*O'Carolan II*); *see Murff*, 615 S.W.2d at 699-700 (listing factors that trial court may consider in exercising its discretion, observing that

3

"[m]athematical precision in dividing property in a divorce is usually not possible," and concluding that "[w]ide latitude and discretion rests in these trial courts and that discretion should only be disturbed in the case of clear abuse"); *see also O'Carolan I*, 71 S.W.3d at 532 ("To constitute an abuse of discretion, the property division must be manifestly unfair.").

In making the determination of a just and right division, the trial court is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Iliff*, 339 S.W.3d at 138 (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986)). The trial court is free to accept or reject the testimony of each witness in whole or in part and to resolve any inconsistencies in the testimony. *Id*. The trial court does not abuse its discretion when it bases its decision on conflicting evidence or when some evidence of a probative and substantive character exists to support the division. *Id*. at 134; *Zieba*, 928 S.W.2d at 787.

## DISCUSSION

### Fraud / waste findings against Janet

In her first issue, Janet asserts that the district court erred in making findings that she breached her fiduciary duty to Greg, committed fraud on the community estate, and wasted community assets. She contends that these findings are not supported by the evidence.

A fiduciary duty exists between a husband and a wife as to the community property controlled by each spouse. *Puntarelli v. Peterson*, 405 S.W.3d 131, 137 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Zieba*, 928 S.W.2d at 789. "In the divorce context, a claim for a breach of fiduciary duty is the same as a claim for fraud on the community," *Ricks v. Ricks*, 169 S.W.3d 523, 526 (Tex. App.—Dallas 2005, no pet.), which is "a judicially created concept based on the theory of constructive fraud," *Zieba*, 928 S.W.2d at 789. No dishonesty of purpose

4

or intent to deceive must be established to prove constructive fraud. *Puntarelli*, 405 S.W.3d at 138. "A presumption of constructive fraud arises where one spouse breaches the fiduciary duty owed to the other spouse and disposes of the other spouse's one-half interest in community property without the other's knowledge or consent." *Wheeling v. Wheeling*, 546 S.W.3d 216, 225 (Tex. App.—El Paso 2017, no pet.).

A related concept is waste of community assets, which occurs when one spouse, dishonestly or purposefully with the intent to deceive, deprives the community estate of assets to the detriment of the other spouse. *Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998). "Evidence of a spouse using excessive funds without the other spouse's consent supports a waste finding." *Wheeling*, 546 S.W.3d at 225 (citing *Graves v. Tomlinson*, 329 S.W.3d 128, 151 (Tex. App.—Houston [14th Dist.] 2010, pet. denied)). "Expenditures for the benefit of a paramour also establish waste," *id.* (citing *Loaiza v. Loaiza*, 130 S.W.3d 894, 900 (Tex. App.—Fort Worth 2004, no pet.)), as do disbursements of community funds to relatives and friends, *see Falor v. Falor*, 840 S.W.2d 683, 688 (Tex. App.—San Antonio 1992, no writ). "Further, while waste claims are often premised on specific transfers or gifts of community property to a third party, a waste judgment can also be sustained by evidence of community funds unaccounted for by the spouse in control of those funds." *Wheeling*, 546 S.W.3d at 225.

In this case, the district court's fraud and waste findings were based primarily on Janet's alleged expenditures of community funds for the benefit of her paramour, Mikulencak. Greg testified that when he and Janet were preparing to sell their marital residence, Janet "took it upon herself to start having the house renovated and to get it prepared for sale" by authorizing Mikulencak to renovate the property. Janet did not ask Greg if it was okay for Mikulencak to start renovating the property. According to Greg, Mikulencak "just showed up" at the house one

5

day to begin work without any explanation from Janet, and Greg "did not interfere" because he "did not want to make a scene in front of the kids." Greg also testified that Janet told him that Mikulencak was living in a rental house that Greg and Janet owned and that "in lieu of any rent that he would be paying" for living there, he would be making repairs to the marital residence. Greg did not believe that "the cost for the rent of the [rental] house would be enough to cover the efforts that [Mikulencak] was putting in for the repairs," and Greg "figured [he] would have to pay him something," but Janet "never told [Greg] what the repairs were going to cost." He explained,

> Sometimes some materials were needed, she would use our joint credit cards to pay for those materials so I was not aware of how much, material wise, we were paying for and how much he was paying for, if any, and I didn't know of any agreement, any contracts between Janet and [Mikulencak]. I just thought we would figure it out. I intended to—I figured I would have to pay him something. I figured at some point Janet would produce this is how much hours, this is how much material that [Mikulencak] spent on the house and if it was reasonable then that would have been fine.

Approximately two days before closing on the sale of their marital residence, Greg learned that, unbeknownst to him, Janet had signed a contract with Mikulencak for repair work on the property. Greg discovered this when the title company informed him that Mikulencak, acting on behalf of his company Centex Solutions, had filed a lien against the property for $72,463.77, which Mikulencak claimed was owed to him "pursuant to a contract by and between Claimant and Janet & Greg Banister" for repairs to the property. Greg testified that he never signed any such contract with Mikulencak. A copy of the contract was admitted into evidence, and it showed that it was signed by Janet but not by Greg. After learning of the lien, Greg "confronted [Mikulencak] to ask him to explain the invoice and give me some detailed

6

information regarding hours and material costs." According to Greg, "His reaction was that he does not do that, he does not divulge hours and material costs, he just puts a number out there." Greg added that he "had doubts about why the total was so high because the work that [Mikulencak] did we had estimates for from another provider" that was less than half the amount that Mikulencak was charging.

Mikulencak also filed a second lien on the property, this one a "six percent finder's fee" for finding a buyer for the marital residence, Koa Short, who Mikulencak claimed was "a friend of a friend." The six percent fee was based on the total amount of the $841,000 sale of the house, which amounted to $50,460.00. Greg found out about this lien "just days before closing," and he testified that before then, he "had no idea" that Mikulencak was claiming any sort of finder's fee in relation to the sale of the house. Greg testified that he did not sign any contract with Mikulencak for a finder's fee, but he learned that Janet did. A copy of this contract, signed by Janet, was admitted into evidence. Greg told Mikulencak that he did not agree to the finder's fee. Nevertheless, Greg paid Mikulencak a three percent finder's fee that they negotiated the day before closing, for approximately $25,000. Greg explained, "I still did not agree to [the finder's fee] but [Janet] offered to lower that to three percent just to try to entice me to go through with the sale of the house." Greg testified that he did not believe it was reasonable to pay Mikulencak anything for the sale of the house but that he "felt pressured from the buyer who threatened to sue for performance on the sale of the contract if I didn't agree to close." Greg explained,

> The whole situation to me seemed like it was designed to force me to agree to the sale of the house with Kevin Mikulencak getting nearly $100,000 from the proceeds of the house and I had only two choices, to not sell the house and incur

the consequences of that from the buyer or to go ahead and sell the house and let Mr. Mikulencak have the $100,000.

Short testified that he found the house "on Zillow as an open house." When he and his wife attended the open house, he met Mikulencak for the first time. Even though Mikulencak showed Short the house, Short's interactions with him did not make him more or less likely to purchase the home. He testified, "I liked the house, it didn't matter what he said or did." Short acknowledged that he warned Greg that he would sue him if Greg did not sell the house to Short.

Mikulencak received other financial benefits from Janet. As mentioned above, Mikulencak lived in a rental home that was owned by the community estate, but Janet did not require him to pay rent or utilities while he lived there. Greg testified that he and Janet had previously rented the house for $900.00 per month, and Mikulencak lived there for approximately six or seven months. During that same time, Janet and Greg spent approximately $1,400 on utilities for the house.

Also, Greg introduced into evidence a spreadsheet of expenditures that, Greg claimed, showed that Janet had spent $10,000 on legal fees for Mikulencak and $17,560 for other legal fees not related to the divorce litigation.

Based on the above, the district court assessed "breach of fiduciary duty / waste claims against Janet Banister" for the following amounts: (1) $72,463.77, the "amount paid to Kevin Mikulencak at closing of [the] marital residence" for repairs to the property; (2) $25,230.00, the "amount paid to Kevin Mikulencak at closing of [the] marital residence as finder's fee"; (3) $6,300, the "loss of rent due to allowing Janet Banister's paramour [to] stay in a rental property of the parties"; (4) $1,400, "the utilities paid for Janet Banister's paramour";

8

(5) $13,500, the "attorney's fees paid by Janet Banister to non-divorce related counsel";[3] and

(6) $10,000, the "attorney's fees paid by Janet Banister for benefit of paramour."

In arguing against these findings, Janet contends that she and Greg were no longer fiduciaries when they sold their marital residence because by then, they had already filed for divorce and retained separate counsel. *See Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 701 n.21 (Tex. App.—Austin 2005, pet. denied) (acknowledging general rule that "[t]he fiduciary duty arising from the marriage relationship does not continue when a husband and wife each hire independent professional counsel to represent them in a contested divorce proceeding" but rejecting "a categorical rule that spouses who hire separate counsel to negotiate a property division can never owe fiduciary duties to one another"). Janet also argues that because she was not the "managing spouse" of the marital residence, she could not have committed any fraud relating to the sale of that property. *See Mazique v. Mazique*, 742 S.W.2d 805, 807-08 (Tex. App.—Houston [1st Dist.] 1987, no writ) (limiting constructive fraud to transfers of community property by spouse who controls property, i.e., "the managing spouse"). Regarding waste, Janet argues that "[t]here was zero evidence that the $72,463.77 and the $25,230.00 claims put forth by [Greg] were done dishonestly, or purposefully with the intent to deprive or deceive [Greg]." Janet makes the same argument regarding the claims for lost rent, utilities paid, and legal fees. Regarding the legal fees, she further argues that Greg "failed to produce any evidence that these amounts are for what he purports them to be, other than listing them on a spreadsheet and scant speculation about the claims."

---

[3] Although Greg's spreadsheet indicated that Janet paid $17,560 for legal fees not related to the divorce litigation, the district court found that Janet paid $13,500.

We will first address the findings regarding the $72,463.77 and $25,230.00 claims related to the sale of the marital residence and the $6,300 and $1,400 claims related to rent and utilities provided to Janet's paramour. Assuming without deciding that there is insufficient evidence to support findings of breach of fiduciary duty / constructive fraud regarding those claims, we conclude that there is sufficient evidence to support findings that Janet wasted community assets. The evidence shows that Janet entered into two contracts with Mikulencak, one to repair the marital residence for $72,463.77, and the other for a "finder's fee" that amounted to $25,230.00. It is undisputed that Greg did not sign either of these contracts and was not made aware of them until days before closing, when the title company informed him of liens on the property filed by Mikulencak. Additionally, Greg testified that Janet told him that Mikulencak would be doing repairs on the property free of charge, in exchange for him living rent-free in one of their rental properties. This representation turned out to be false. Regarding the finder's fee, Short testified that he did not meet Mikulencak until after he had already found the house on Zillow and that his decision to purchase the residence was not based on anything that Mikulencak said or did. Greg did not believe that Mikulencak should receive any finder's fee, but Janet offered to lower the fee from six percent to three percent "just to try to entice [Greg] to go through with the sale of the house." Although Greg ultimately agreed to pay Mikulencak, he agreed to do so only because there were liens on the property at closing and the buyer was threatening to sue Greg if he did not follow through on the sale. As Greg explained, "The whole situation to me seemed like it was designed to force me to agree to the sale of the house with Kevin Mikulencak getting nearly $100,000 from the proceeds of the house." A factfinder also could infer that Greg allowed Mikulencak to live in the rental house without requiring Mikulencak to pay rent or utilities because Janet caused Greg to believe that "in lieu of

any rent that he would be paying" for living there, Mikulencak would be making repairs to the marital residence. Although Mikulencak made repairs to the house, they were not free, contrary to Janet's claim. We conclude that this evidence is sufficient to prove that Janet, dishonestly or purposefully with the intent to deceive Greg, deprived the community estate of assets to Greg's detriment.

Janet further argues that the evidence is insufficient to support the full amount assessed against her. Greg testified that he was planning on repairing the marital residence to prepare it for sale and that he had received a bid on the repairs for approximately $30,000. On cross-examination, Greg agreed that the repairs to the property increased the home's resale value and that he suffered damages in the amount over the $30,000 that he would have paid anyway for the repairs. Accordingly, of the $72,463.77 that Greg paid Mikulencak for repairs, only $42,463.77 was to his detriment. Thus, Janet argues the amount assessed against her for waste was overvalued by $30,000.

Additionally, Janet claims that there is scant evidence in the record regarding the $23,500 in legal fees allegedly incurred by Janet for non-divorce related litigation, other than them being listed on a spreadsheet produced by Greg showing various payments to law firms without explanations for those payments. She states that no evidence would enable a factfinder to infer that Janet made these payments fraudulently, such as to support a claim for breach of fiduciary duty / constructive fraud, or that she made these payments dishonestly or purposefully with intent to deceive Greg, which would support a claim for waste. Assuming without deciding that Janet is correct, out of a total of $128,893.77 assessed against Janet for "breach of fiduciary duty / waste," $53,500.00 would not have been supported by some evidence of a substantive and probative character.

11

Nevertheless, our ultimate inquiry concerns the trial court's overall division of the community estate, and that division "should be corrected on appeal only when an abuse of discretion has been shown." *Murff*, 615 S.W. 2d at 698. "To constitute an abuse of discretion, the property division must be manifestly unfair," *O'Carolan I*, 71 S.W.3d at 532, and "the appellant bears the burden to show from the record that the division was so disproportionate, and thus unfair, that it constitutes an abuse of discretion," *O'Carolan II*, 414 S.W.3d at 311. "Moreover, we should reverse a court's division of property only if the error materially affects the court's just and right division of the property." *Von Hohn v. Von Hohn*, 260 S.W.3d 631, 640-41 (Tex. App.—Tyler 2008, no pet.). "A de minimis effect does not require reversal." *Roberts v. Roberts*, 402 S.W.3d 833, 839 (Tex. App.—San Antonio 2013, no pet.).

Here, in its property division spreadsheet, the district court valued the community estate at $3,993,630. On this record, we cannot conclude that overvaluing the amount of Janet's waste by $53,500, which represents approximately 1.34% of the estate's value, resulted in a "manifestly unfair" division of the property or had anything more than a de minimis effect on the district court's division of the property, particularly considering that the district court awarded Greg 50.15% of the estate and Janet 49.85% of the estate. As discussed above, there was sufficient evidence to support a finding that Janet wasted at least $75,393.77 of community assets, and Janet has failed to carry her burden to show that the district court's accounting for an additional amount of waste resulted in an overall division of the community estate that was "so disproportionate" or "so unjust and unfair" that it constituted an abuse of the district court's broad discretion in dividing the estate. *See, e.g.*, *Schlueter*, 975 S.W.2d at 589 (explaining that trial courts "have wide discretion and are allowed to take many factors into consideration in making a just and right division, including wasting of community assets" (internal citation

12

omitted)); *Wheeling*, 546 S.W.3d at 227 (concluding that there was sufficient evidence that wife wasted community assets and that, even if evidence was insufficient, wife failed to meet her "burden to show that the alleged error caused the trial court to abuse its discretion in the overall division of the community estate" or that "this error, if any, had more than a de minimis effect on the just and right division of the community estate"); *see also Diaz Maldonado v. Medrano*, No. 13-18-00525-CV, 2019 WL 3953110, at *4 (Tex. App.—Corpus Christi-Edinburg Aug. 22, 2019, no pet.) (mem. op.) (concluding that wife, when challenging trial court's finding that she committed constructive fraud, "failed to carry her burden on appeal of showing from the evidence in the record that the trial court's division of the community estate was so unjust and unfair as to constitute an abuse of discretion"); *Bennett v. Bennett*, No. 09-17-00162-CV, 2019 WL 1940859, at *12 (Tex. App.—Beaumont May 2, 2019, no pet.) (mem. op.) (concluding that there was sufficient evidence to support trial court's waste finding and that, even if appellate court "were to have reached a different conclusion . . . as to the sufficiency of the remainder of the evidence" regarding waste, husband "failed to meet his burden" to "demonstrate that the alleged error caused the trial court to abuse its discretion in the overall division of the community estate"); *In re Marriage of Garcia*, No. 14-17-00444-CV, 2019 WL 1523483, at *4-5 (Tex. App.—Houston [14th Dist.] Apr. 9, 2019, no pet.) (mem. op.) (explaining that appealing party "must not only show that there is insufficient evidence to support the trial court's waste finding, but also that the erroneous finding caused the trial court to abuse its discretion in the overall division of the community estate").

We overrule Janet's first issue.

**Characterization of property**

During the marriage, Janet and her brother John formed a company, Landsraad, LLC, that bought land. Janet and John each acquired a 50% ownership interest in the company. The district court characterized Janet's interest in Landsraad as community property. In Janet's second issue, she asserts that this interest should have been characterized as her separate property.[4]

In dividing the marital estate, "[t]rial courts can only divide community property," not separate property. *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011). Community property is the property, other than separate property, acquired by either spouse during marriage. Tex. Fam. Code § 3.002. Separate property is the property owned or claimed by the spouse before marriage, as well as property that the spouse acquired during marriage by gift, devise, or descent. Tex. Const. art. XVI, § 15; Tex. Fam. Code § 3.001.

Property possessed by either spouse during or on dissolution of marriage is presumed to be community property. Tex. Fam. Code § 3.003(a). "Parties claiming certain property as their separate property have the burden of rebutting the presumption of community property." *Pearson*, 332 S.W.3d at 363. Meeting this burden requires tracing and clearly identifying the property in question as separate by clear and convincing evidence. *Id.*; *see* Tex. Fam. Code § 3.003(b) ("The degree of proof necessary to establish that property is separate property is clear and convincing evidence."). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code

---

[4] Greg asserts that Janet failed to preserve error on this issue. However, Janet argued during trial that Landsraad was separate property and objected to the characterization of it as community property. Thus, she preserved error. *See* Tex. R. App. P. 33.1(a).

§ 101.007; *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 354 (Tex. App.—Austin 2002, pet. denied).

"Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Ganesan*, 96 S.W.3d at 354 (citing *Whorrall v. Whorrall*, 691 S.W.2d 32, 35 (Tex. App.—Austin 1985, writ dism'd)). In determining the separate or community character of a corporation formed during a marriage, Texas courts "require the parties to clearly trace the separate and community property assets that were contributed during the formation of the corporation." *Allen v. Allen*, 704 S.W.2d 600, 604 (Tex. App.—Fort Worth 1986, no writ) (citing *Vallone v. Vallone*, 644 S.W.2d 455, 457 (Tex. 1982); *Marriage of York*, 613 S.W.2d 764, 769–70 (Tex. App.—Amarillo 1981, no writ)). "Corporations organized during marriage and capitalized entirely with traceable separate property of one spouse are characterized as the separate property of that spouse." *Id*. (citing *Holloway v. Holloway*, 671 S.W.2d 51, 56–57 (Tex. App.—Dallas 1983, writ dism'd)).

Janet testified that she formed and acquired her 50% ownership interest in Landsraad in 2008, during her marriage to Greg. The agreement to form the company (the Agreement) indicated that Janet made a $500 capital contribution to acquire her ownership interest, although the Agreement does not specify the source of that contribution. At the time of trial, Landsraad owned three parcels of land in Taylor, Texas, two that originally belonged to Janet's great grandparents (the Windy Ridge properties) and one that Landsraad purchased directly through a realtor (the Rowe Valley property). The record reflects that all three properties were acquired by Landsraad after the company was formed. On December 26, 2008, approximately seven months after Landsraad was formed, Landsraad made a resolution under

which Janet, as president of the company, was authorized to purchase the Windy Ridge properties and to borrow $346,440 from her mother to purchase these properties. The Rowe Valley property was purchased sometime after that. Although Janet characterized the Windy Ridge properties as an "inheritance" from her family, she testified that she had purchased the properties from her mother by taking out a note on the property, the current balance of which was approximately $145,000 that she still owed to her mother.

Greg testified that Landsraad was a "50/50 partnership" formed between Janet and her brother, that the partnership had purchased land from Janet's mother, and that "there's a loan associated with that transaction," which the partnership "pays [] back every month." Greg also testified that he and Janet contributed community funds to Landsraad in an amount between $1,000 and $2,000 monthly to make payments on the loan. The total amount that they contributed was approximately $151,275.

Janet's mother Virginia Debus testified that her intent in transferring the Windy Ridge properties was to "give it as a gift to my children" and not to their spouses. Virginia denied that there was any loan on the property. Janet's brother John testified that the transfer of the Windy Ridge properties "was set up as a purchase" through their mother, who owned the land after their father died. The intent of the purchase was to "buy out" their siblings, the other heirs to the land, so that Janet and John could own it in full. John explained, "[T]he way it was set up, [Virginia] would gift the children their part of this inheritance each year and we funneled ours back to her as payments toward the purchase so we didn't keep any of the money, it just went to pay the payments."

Two versions of the Agreement were admitted into evidence. Both versions of the Agreement are largely identical, except that the second version of the Agreement includes

16

provisions that "if the marital relationship of a Member is terminated by divorce, such Member's interest in the Company shall be deemed separate property" and that "the Assignee Spouse," i.e., the spouse of either Janet or John, "waives any and all community property rights." Also, the second version of the Agreement is missing a right-of-first-refusal provision that is referenced in both versions of the Agreement and misspells the name of Landsraad as "Landraad" in the footer of the document. The signatures of the parties appear identical in each version of the Agreement. A hotly contested issue at trial was whether the first or second version of the Agreement was the authentic version. Janet claimed that the second version of the Agreement was the one that she and Greg had signed "because that's the only one" that she had in her possession. Greg claimed that the first version of the Agreement, which did not waive his community-property rights, was the one that they had signed. Greg testified, "I would have never signed a document . . . waiving any claim that the value of the entity is not community property and I would never have waived any right to reimbursements for the monthly payments that we make."

We conclude that the above evidence falls short of proving by "clear and convincing evidence" that Janet's interest in Landsraad was separate property. She formed the company during the marriage, and there is no evidence in the record that she used separate property to acquire her 50 percent ownership interest in the company. To the extent that Janet's mother intended the Windy Ridge properties to be a gift to Janet, the properties were acquired several months after Landsraad was formed, so they could not have been used to acquire Janet's ownership interest in Landsraad. Moreover, a gift is a voluntary transfer of property to another made gratuitously and without consideration. *Nipp v. Broumley*, 285 S.W.3d 552, 558 (Tex. App.—Waco 2009, no pet.). Evidence was presented that Landsraad purchased the Windy Ridge properties from Janet's mother, and it did so by taking out a $346,440 note on the

17

property, which Greg testified was being repaid monthly to Janet's mother from community funds. Thus, we cannot say that there is clear and convincing evidence that the Windy Ridge properties were a gift to Janet, even if her mother claimed that they were. Finally, there was conflicting evidence presented on whether the parties signed the first or the second version of the Agreement, and we cannot say that there was "clear and convincing evidence" that the authentic version of the Agreement was the one that characterized Landsraad as separate property and that waived "any and all" of Greg's community property rights. The trial court reasonably could have credited Greg's testimony that he willingly used approximately $151,275 of community funds to repay the loan that Landsraad took out to purchase the Windy Ridge properties. We conclude that the district court did not err in characterizing Janet's ownership interest in Landsraad as community property.

We overrule Janet's second issue.

**Appraisal of rental properties**

Janet and Greg owned ten rental properties at the time of the divorce, and each used separate real estate appraisers to value the properties. Each came up with different appraisals of the properties, and the district court valued the properties using the appraisals provided by Vance Powell, Greg's expert, rather than the appraisals provided by Christopher Hogue, Janet's expert. In her third issue, Janet asserts that the district court abused its discretion by crediting the appraisals of Greg's expert on seven of the rental properties. She further asserts that the district court erred by failing to deduct the "costs of sale" from the value of those properties.

In valuing the assets in an estate, "[w]here the uncontested evidence establishes only one value, the trial court cannot draw a different inference." *Banker v. Banker*, 517 S.W.3d 863, 870 (Tex. App.—Corpus Christi-Edinburg 2017, pet. denied). However, "if several values are given, or if a witness testifies that the value may be higher or lower than his estimate, the court's determination of the value should be within the ranges in the evidence." *Id*. (citing *Van Heerden v. Van Heerden*, 321 S.W.3d 869, 880 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Mata v. Mata*, 710 S.W.2d 756, 758 (Tex. App.—Corpus Christi 1986, no writ)). So long as the value is within that range, there is no abuse of discretion. *See Pelzig v. Berkebile*, 931 S.W.2d 398, 403 (Tex. App.—Corpus Christi-Edinburg 1996, no writ).

Powell testified that he has been in the appraisal business since 1973 and that since 1975, he has been appraising residential real property specifically within and around the Williamson County area, which is where the subject properties were located. Powell also testified that he is a member of the Appraisal Institute, a Senior Residential Appraiser, a general certified state appraiser for the State of Texas, and a realtor. He testified extensively regarding his methodology for appraising residences and provided detailed explanations for his appraisals of the properties. Nevertheless, Janet argues that Powell's appraisals were not credible because he "never walked inside of any of the properties in question" to see the repairs that she asserts were needed. However, Powell testified that Janet and Mikulencak, the manager of the properties, did not allow him inside the properties when he was preparing his appraisals and only gave him permission to enter the properties shortly before trial. Additionally, Powell provided extensive testimony as to why he believed the appraisals of Hogue, Janet's appraiser, were unreliable, including Hogue's inexperience in the appraisal business. The district court, as the judge of the weight and credibility of the witnesses, was entitled to credit the opinions of Powell

19

and to discredit the opinions of Hogue. On this record, we cannot conclude that the district court abused its discretion in assigning values to the properties that were consistent with Powell's appraisals.

Regarding the costs of selling the properties, although a trial court has discretion to deduct such costs from its property valuation, *see, e.g.*, *Pelzig*, 931 S.W.2d at 403; *Cole v. Cole*, 880 S.W.2d 477, 484 (Tex. App.—Fort Worth 1994, no writ), such a deduction is not mandatory. Furthermore, Janet testified that she doubted the properties could be sold currently "because the market is so high right now" that potential buyers would "not be able to get a bank loan," and she also testified that continuing to rent the properties was her "best hope for a prosperous life of any kind." Accordingly, the district court would not have abused its discretion in finding that any potential sale of the properties was speculative and uncertain at the time of trial and in declining to deduct the costs of sale from the valuations for that reason.

We overrule Janet's third issue.

**Exclusion of witness**

At trial, Janet attempted to call her sister-in-law, Gretchen Toler, to testify regarding the Landsraad contract. Toler, the wife of Janet's brother John, had signed the contract along with Janet, Greg, and John. However, during discovery, Janet failed to disclose Toler as a witness, and the district court, following Greg's objection to Toler's testimony for that reason, excluded Toler as witness. *See* Tex. R. Civ. P. 193.6(a). In her fourth issue, Janet asserts that the district court abused its discretion in doing so.

Greg argues that Janet failed to preserve error on this issue. To preserve error concerning the exclusion of evidence, the complaining party must demonstrate the substance of

20

the excluded evidence through an offer of proof or a bill of exception unless the substance of the evidence is apparent from the context. Tex. R. Evid. 103(a)(2); *Compton v. Pfannenstiel*, 428 S.W.3d 881, 885 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Sink v. Sink*, 364 S.W.3d 340, 347 (Tex. App.—Dallas 2012, no pet.). "The reviewing court may be able to discern from the record the nature of the evidence and the propriety of the trial court's ruling; however, without an offer of proof, we can never determine whether exclusion of the evidence was harmful." *Sink*, 364 S.W.3d at 347.

Here, Janet argued at trial that Toler "has personal knowledge of the contract" but never made an offer of proof or a bill of exception showing the substance of Toler's testimony regarding the contract. Without that information, we could not conclude that Janet was harmed by the exclusion of Toler's testimony, even if the exclusion had been erroneous. Accordingly, we conclude that Janet failed to preserve error on this point. *See Compton*, 428 S.W.3d at 886; *Sink*, 364 S.W.3d at 347 (Tex. App.—Dallas 2012, no pet.); *see also Triesch v. Triesch*, No. 03-15–00102–CV, 2016 WL 1039035, at *6 (Tex. App.—Austin Mar. 8, 2016, no pet.) (mem. op.).

We overrule Janet's fourth issue.

**Proceeds from the marital residence**

Janet and Greg each received approximately $204,000 from the sale of their marital residence. However, in its division of property, the district court listed this amount as an asset for Janet but not for Greg. In her fifth issue, Janet asserts that this resulted in a division of the community estate that was not just and right. In Janet's view, "the trial court should have

21

either assigned both parties the same amount on the division spreadsheet or decline[d] to assign the amount to either party."

In a divorce decree, a trial court must "order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." Tex. Fam. Code § 7.001; *see Bradshaw v. Bradshaw*, 555 S.W.3d 539, 543 (Tex. 2018) (defining "just," "right," and "due regard" and describing abuse of discretion standard for reviewing trial court's division of marital estate). The division must be equitable, but the trial court does not have to divide the marital estate equally. *Murff*, 615 S.W.2d at 698–99. If there is a reasonable basis for an unequal division of the property in the record, the trial court has not abused its discretion. *See id.*; *O'Carolan I*, 71 S.W.3d at 532 (explaining that trial court's discretion is not unlimited and that there must be a reasonable basis for division).

Here, there is a reasonable basis in the record for the unequal division of the proceeds. "The value of community assets is generally determined at the date of divorce or as close to it as possible." *Wheeling*, 546 S.W.3d at 228 (citing *Handley v. Handley*, 122 S.W.3d 904, 908 (Tex. App.—Corpus Christi-Edinburg 2003, no pet.); *Grossnickle v. Grossnickle*, 935 S.W.2d 830, 837 (Tex. App.—Texarkana 1996, writ denied)). Evidence was presented that at the time of the divorce, Janet still had possession of her proceeds from the sale of the residence. Specifically, in a document handwritten by Janet entitled, "Trace of Proceeds from Sale of 36 Woodland Loop [the marital residence]" that was produced during discovery, Janet wrote that $80,309 of the proceeds was in a "money order I have," another $80,000 was "cash in [a] safe," and the other $44,000 was deposited into an account that Janet owned. The document further stated that Janet had $204,309 "Total Available Funds in account statements." This was

22

the exact amount that the district court listed as an asset for Janet from the sale of the proceeds. When asked if she thought it was fair that the sale proceeds be reflected as an asset awarded to her, Janet testified, "I do." On the other hand, Greg testified that he had only approximately $15,200 remaining from his proceeds of the sale because he had spent most of the proceeds on paying off his and Janet's credit cards and on his living expenses. Based on this evidence, we cannot conclude that the district court abused its discretion in listing Janet's proceeds from the sale as an asset but in not doing the same for Greg.

We overrule Janet's fifth issue.

**Spousal maintenance**

In her sixth issue, Janet asserts that the district court abused its discretion in failing to award her any spousal maintenance. She argues that she is entitled to spousal maintenance because she lacks sufficient property and income to meet her minimum reasonable needs, has not worked outside of the home in over 20 years, and her only source of income was from her employment with Greg's business.

Family Code Chapter 8 governs the award of spousal maintenance in a divorce decree. *See* Tex. Fam. Code §§ 8.001-.359; *Dalton v. Dalton*, 551 S.W.3d 126, 130 (Tex. 2018) ("In 1995, the Texas Legislature first authorized courts to award a form of involuntary post-divorce alimony referred to as 'spousal maintenance.'"). The Family Code defines "maintenance" as "an award in a suit for dissolution of a marriage of periodic payments from the future income of one spouse for the support of the other spouse." Tex. Fam. Code § 8.001(1). "The legislative purpose in enacting provisions for spousal maintenance was to provide temporary and rehabilitative support for a spouse whose ability for self-support is lacking or has

23

deteriorated over time while engaged in homemaking activities and whose capital assets are insufficient to provide support." *O'Carolan I*, 71 S.W.3d at 533.

The Family Code authorizes trial courts to award spousal maintenance in "very limited circumstances" if the parties meet certain eligibility requirements. *Dalton*, 551 S.W.3d at 130 (quoting *McCollough v. McCollough*, 212 S.W.3d 638, 645 (Tex. App.—Austin 2006, no pet.)). In this case, Janet would be eligible for spousal maintenance if she (1) lacks sufficient property, including her separate property, on dissolution of the marriage to provide for her minimum reasonable needs; (2) has been married to Greg for 10 years or longer; and (3) lacks the ability to earn sufficient income to provide for her minimum reasonable needs. Tex. Fam. Code § 8.051(2)(B).

Janet, who was 54 years old at the time of trial, worked for Shell Oil until 2000 and began working for Greg's software-development company in 2003, although the nature of her work at the company was unclear.[5] Janet continued to work for Greg's company at the time of trial, although she testified that her employment there would end when the divorce was finalized. Janet also owned a business called Diamond Property Holdings, LLC, and she testified that this business involved buying distressed properties, fixing them up, and then either renting or "flipping" the properties. Janet testified that this would be her only source of income following the divorce and that it would be "three to five years" before all ten properties that she owned could be a reliable source of steady income for her. She opined that even though she had

---

[5] Greg testified that although Janet was "technically" an employee of his company and was on payroll so that contributions could be made to her retirement accounts, Janet was not involved with the company "at all." Janet disputed that she had no role in Greg's company but acknowledged that when she first started working for him, she thought she "was going to do the marketing and he was going to do the software but apparently his thoughts were different and he did not want me to be part of that company."

24

two degrees, including one from Texas A&M, she did not believe that she could start another career at her age because her "job had been relegated to just taking care of the kids so [she] lost [her] skills for 15 years." When asked how much she was requesting that the court award her in spousal maintenance, Janet testified that she was "not sure [of] the exact number" but that the monthly payment on the notes for the rental properties was $11,000 and that she was currently earning monthly income of $4,000 from her rental properties "due to COVID." To help offset that deficit, Janet was asking for $3,000 a month for a duration of "somewhere between three to five years."

Greg testified that Janet's job at Shell Oil involved marketing and real estate and that she had quit in 2000 to help raise their children. In 2003, Janet began working for Greg's company, where she made approximately $43,000 per year. Greg acknowledged that he planned on terminating Janet's employment from his company upon the granting of their divorce. Greg testified that he was opposed to paying spousal maintenance to Janet because she "has enough assets to where she doesn't need it," "has income from her real estate business," and was apparently "employed by Centex Solutions which is Kevin Mikulencak's company." A copy of a business card was admitted into evidence that listed Janet as the "Operations Manager" for Centex Solutions, Inc., which was Mikulencak's "roofing and remodeling" business. Janet denied that she worked for Centex Solutions or was receiving any money from either the company or Mikulencak. When confronted with the business card from Centex Solutions that had her name on it, Janet testified that she recognized the card but denied creating or using it.

The record also reflects that the district court awarded Janet $1,961,001 of the net community estate, which included $215,000 in cash and banking accounts, multiple rental-producing properties in Williamson County, and Janet's interest in Landsraad, which owned

25

three other properties in Williamson County. The district court could have reasonably inferred that this property was sufficient to meet Janet's minimum reasonable needs. Additionally, Janet owned her own company that rented homes in Williamson County, she was earning at least $4,000 per month from that business, and there was some evidence presented that Janet worked for Mikulencak's company, Centex Solutions, as an Operations Manager. From this evidence, the district court could have reasonably inferred that Janet did not lack the ability to earn sufficient income to provide for her minimum reasonable needs. We cannot conclude on this record that the district court's decision to deny Janet's request for spousal maintenance was "manifestly unfair." *See Chafino v. Chafino*, 228 S.W.3d 467, 475 (Tex. App.—El Paso 2007, no pet.); *see also Browne v. Browne*, No. 03-08-00185-CV, 2010 WL 1730066, at *3-4 (Tex. App.—Austin Apr. 29, 2010, no pet.) (mem. op.).

We overrule Janet's sixth issue.

## CONCLUSION

We have found no abuse of discretion or error in the district court's divorce decree; therefore, we affirm.

 

_____

Gisela D. Triana, Justice

Before Justices Baker, Triana, and Theofanis

Affirmed

Filed: June 13, 2023